1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MARIA DEL SOCORRO QUINTERO          CASE NO. 13cv1417-WQH-
     PEREZ C.Y., a Minor, and B.Y., a          BGS
12   Minor,
                                               ORDER
13                          Plaintiffs,

14          vs.

15   UNITED STATES OF AMERICA,
     UNITED STATES DEPARTMENT
16   OF HOMELAND SECURITY,
     UNITED STATES CUSTOMS AND
17   BORDER PROTECTION OFFICE OF
     BORDER PATROL, JANET
18   NAPOLITANO, THOMAS S.
     WINKOWSKI, DAVID AGUILAR,
19   ALAN BERSIN, KEVIN K.
     McALEENAN, MICHAEL J.
20   FISHER, PAUL A. BEESON,
     RICHARD BARLOW, RODNEY S.
21   SCOTT, CHAD MICHAEL NELSON,
     and DORIAN DIAZ, and DOES 1-50,
22
                          Defendants.

23   HAYES, Judge:

24          The matters before the Court are: (1) the Motion to Dismiss (ECF No. 26) filed

25   by Defendants United States of America, United States Department of Homeland

26   Security ("DHS"), United States Customs and Border Protection ("CBP"), and Office

27   of Border Patrol ("OBP") (collectively "the Government Defendants"), together with

28   Janet Napolitano, Thomas Winkowski, Alan Bersin, Kevin McAleenan, Michael Fisher,

Paul Beeson, Richard Barlow, and Rodney Scott (collectively "the Supervisor Defendants");[1] (2) the Motion to Dismiss (ECF No. 27) filed by the Supervisor Defendants in their individual capacities[2] and Chad Nelson and Dorian Diaz (collectively "the Agent Defendants"); and (3) the Motion for Leave to Conduct Jurisdictional Discovery filed by Plaintiffs (ECF No. 31).

## I. Background

On June 17, 2013, Plaintiffs Maria Del Socorro Quintero Perez ("Del Socorro"), the widow of Jesus Alfredo Yañez Reyes ("Yañez"), and CY and BY, the minor children of Yañez, commenced this action, seeking damages for the death of Yañez, as well as declaratory relief. (ECF No. 1). On January 2, 2014, Plaintiffs filed the First Amended Complaint ("FAC"), which is the operative complaint. (ECF No. 25). On February 18, 2014, the Government Defendants and Supervisor Defendants sued in their official capacities filed the pending Motion to Dismiss Plaintiffs' First Amended Complaint. (ECF No. 26). The Government and Supervisor Defendants assert that all of Plaintiffs' claims should be dismissed against them on grounds of sovereign immunity. In addition, they seek dismissal of Plaintiffs' Eighth Claim for Declaratory Judgment as moot and unripe. Finally, the Government Defendants and Supervisor Defendants seek dismissal of Plaintiffs' request for attorney's fees as unrecoverable.

On the same date, the Supervisor Defendants sued in their individual capacities and the Agent Defendants filed the pending Motion to Dismiss Plaintiffs' First Amended Complaint. (ECF No. 27). The Supervisor Defendants and Agent Defendants assert a lack of personal jurisdiction over Defendants Winkowski, Aguilar, and McAleenan; seek dismissal of all Defendants from all claims, based on qualified

---

[1] These Defendants were sued in both their official and individual capacities and bring this motion in their official capacities.

[2] David Aguilar, also a Supervisor Defendant, was sued in his individual capacity only and joins in this motion to dismiss in addition to all other Supervisor Defendants. The Supervisor Defendants sued in their individual capacities are Janet Napolitano, Thomas Winkowski, David Aguilar, Alan Bersin, Kevin McAleenan, Michael Fisher, Paul Beeson, Richard Barlow, and Rodney Scott.

immunity and failure to state a claim, except for the Fourth Amendment claim (Claim Five) against Agent Diaz; and seek dismissal of Plaintiffs' request for attorneys' fees as unrecoverable. On March 27, 2014, Plaintiffs filed their oppositions. (ECF Nos. 32, 33). On April 17, 2014, Defendants filed their replies. (ECF Nos. 36, 37).

On March 27, 2014, Plaintiffs filed the pending Motion for Leave to Conduct Jurisdictional Discovery. (ECF No. 31). On May 1, 2014, Defendants Aguilar, McAleenan, and Winkowski filed an opposition. (ECF No. 39). On May 8, 2014, Plaintiffs filed a reply. (ECF No. 40).

On April 10, 2014, Plaintiffs, the Government Defendants, and the Supervisor Defendants sued in their official capacities filed a Joint Motion to Dismiss. (ECF No. 34). The motion stipulated to dismissal with prejudice of the Government Defendants and Supervisor Defendants in their official capacities from all claims but Plaintiffs' First Claim, and Plaintiffs' Eighth Claim. On April 15, 2014, the Court granted the Joint Motion to Dismiss.[3] (ECF No. 35). Plaintiffs' Second, Fourth, and Sixth Claims are asserted against the Supervisor Defendants in their individual capacities.

## II. Allegations of the FAC

### A. The Shooting

On June 21, 2011, Yañez and Jose Ibarra-Murrieta ("Murrieta") "crossed the border from Mexico to the United States together." (ECF No. 25 at 10). With Murrieta in the lead, the two crossed the primary border fence, where Murrieta encountered United States Border Patrol Agent Nelson. "Upon seeing Agent Nelson, Murrieta leapt back into the culvert and began scaling a pole up the side of Stuart's Bridge." *Id.* at 11. United States Border Patrol Agent Diaz cut off Murrieta's escape, and Murrieta "descended back into the culvert where Agent Nelson waited." *Id.* Murrieta initially evaded Agent Nelson, but while he was being chased, he "tripped and fell to the ground" and "Agent Nelson grabbed him by the neck in an attempt to subdue him." *Id.*

---

[3] The April 15, 2014 order omitted the Department of Homeland Security from the list of Government Defendants dismissed from Plaintiff's Second, Fourth, and Sixth Claims.

1  "Yañez, who had stayed in the culvert near the primary fence, escaped back to Mexico

2  through the small hole in the fence." *Id.* "Yañez climbed into a tree that leaned against

3  the southern side of the primary fence near the area where Agent Nelson and Murrieta

4  were grappling in the road." *Id.* at 12.  While attempting to subdue Murrieta, Agent

5  Nelson "admittedly began to strike Murrieta while pinning him to the ground." *Id.* at

6  11.

7  From this point forward, the FAC recounts both the Agents' and Murrieta's

8  versions of the events.  According to Agent Nelson and Agent Diaz, while Agent

9  Nelson and Murrieta were struggling, Yañez then "threw two rocks (per Agent Nelson)

10  or one or possibly two rocks (per Agent Diaz) at Agent Nelson." *Id.* at 12.  "The

11  Agents admit that the rock(s) was somewhere between the size of a golf ball and a

12  baseball." *Id.* Yañez then threw a "nail-studded board that struck Agent Nelson in the

13  head, glancing off his hat." *Id.* At this time, "Diaz arrived to help subdue Murrieta.

14  Agent Diaz allegedly told Yañez to get off the fence, and then began helping Agent

15  Nelson get control of Murrieta." *Id.* "Agent Nelson acknowledges that then, without

16  any warning and any further alleged throwing of a rock or board by Yañez, Agent

17  Nelson pulled away from the scuffle with Murrieta.  Agent Diaz removed his sidearm

18  from its holster, uttered not a single additional word, and shot Yañez in the head." *Id.*

19  Murrieta's version of events "differs markedly." *Id.* at 13.  According to

20  Murrieta, Yañez "never threw anything at Nelson or anyone else." *Id.* at 14.  "Instead,

21  both Agent Nelson and Agent Diaz had Murrieta on the ground and were beating him.

22  Agents Nelson and Diaz easily outweighed and outmuscled the slight-framed Murrieta,

23  who was facedown in the dirt road." *Id.* "In an apparent attempt to stop the attack,

24  Yañez yelled that he was going to use his cellphone to take video and pictures of the

25  beating.  Upon hearing Yañez's threat to record the Agents' attack on Murrieta, Agent

26  Diaz stopped beating Murrieta, stood up, and, without warning or provocation, shot

27  Yañez in the head." *Id.* at 14.

28  "Whichever of these two versions of the shoot the jury believes, the Agents

1  unlawfully used excessive, lethal force against Yañez." *Id.*

2      **B. The Rocking Policy**

3      The shooting of Yañez was not a "spontaneous act," but an action taken pursuant

4  to the "Rocking Policy," a policy with the "imprimatur of the highest-ranking DHS

5  officials." *Id.* at 15, 16. "Pursuant to this unlawful Rocking Policy, Border Patrol

6  agents along the southern border regularly use excessive, lethal force against persons

7  of perceived Hispanic descent and Mexican nationality." *Id.*   The Supervisor

8  Defendants, which include high ranking DHS officials, such as Janet Napolitano,

9  Secretary of DHS, and local Border Patrol supervisory personnel, such as Rodney Scott,

10  the Acting Deputy Chief Patrol Agent of the Border Patrol's San Diego Sector, "knew,

11  or reasonably should have known, that Border Patrol agents along the southern border

12  ... had a regular pattern and practice of implementing a Rocking Policy pursuant to

13  which agents deemed others' throwing of rocks at them to be per se lethal force that

14  justifies the agents' shooting to kill the alleged rock-throwers." *Id.* at 16. "Despite

15  repeated public statements by agents' representatives that the Rocking Policy is lawful

16  and appropriate, and despite the evidence (including video evidence) of agents' regular

17  use of excessive, lethal force along the southern border, none of the Government

18  Defendants or Supervisor Defendants objected to or demanded a stop to such unlawful

19  force." *Id.* at 27. "For example, on June 9, 2010, the National Border Patrol Council

20  of the American Federation of Government Employees ('NBPC') issued a nationwide

21  press release that succinctly stated the Rocking Policy." *Id.* at 17. The FAC identifies

22  fourteen instances of Border Patrol agents killing persons at the border in response to

23  alleged rock throwing. In one instance, at the border near El Paso, the Department of

24  Justice and the president of the NBPC concluded that the shooting of a Mexican

25  teenager was justified. Although the teenager was allegedly throwing rocks at Border

26  Patrol agents, the allegation was proven to be untrue by three videos of the event.

27      In addition, the Government and Supervisor Defendants have shown "consistent

28  disregard of complaints regarding the Rocking Policy." *Id.* at 22. The FAC alleges ten

instances where "national and international organizations have condemned the Border Patrol's routine use of excessive, lethal force along the southern border." *Id.* For example, according to the Huffington Post, the Mexican Attorney General told Defendant Napolitano that an alleged border shooting of a Mexican national in response to rock throwing was an "unjustified use of force against our population." (ECF Nos. 25 at 25, 32-1 at 152). Additionally,

> [t]he DHS commissioned the Police Executive Research Forum ('PERF') to provide expert, objective guidance to DHS and CBP regarding the use of lethal force in response to alleged rock-throwing . . . PERF carefully studied the issue and submitted a report to DHS and CBP advising that the Rocking Policy is unlawful and that those agencies should no longer permit agents to treat the throwing of rocks at them as per se deadly force to which they can respond with lethal gunfire. On November 5, 2013, Defendant Fisher announced that the agencies had decided to reject the expert, objective recommendation that they had commissioned PERF to provide, and instead to reaffirm yet again the unlawful Rocking Policy.

(ECF No. 25 at 26-27).

Finally, the Government and Supervisor Defendants "have knowingly failed to provide for adequate training of Border Patrol agents concerning the proper use of force" by failing "to ensure that the agents knew that the Rocking Policy is unlawful under international and domestic law." *Id.* at 27. They have also "failed to take timely and effective measures to prohibit, prevent, and punish such practices and to punish or discipline the perpetrators and responsible commanders." *Id.* at 28.

The FAC asserts the following claims for relief: (1) violation of the law of nations against the Government Defendants; (2) violation of the Fifth Amendment Due Process Clause against the Government Defendants and Supervisor Defendants; (3) violation of the Fifth Amendment Due Process Clause against the Agent Defendants; (4) violation of the Fourth Amendment's prohibition against unreasonable seizures against the Government Defendants and Supervisor Defendants; (5) violation of the Fourth Amendment's prohibition against unreasonable seizures against the Agent Defendants; (6) violation of the Fifth Amendment's Equal Protection Clause against the Government Defendants and Supervisor Defendants; (7) violation of the Fifth

Amendment's Equal Protection Clause against the Agent Defendants; and (8) Declaratory Relief regarding the judgment bar provision of the Federal Tort Claims Act ("FTCA").

## III. The Government and Supervisor Defendants' Motion to Dismiss (ECF No. 26) Based on Sovereign Immunity

Subsequent to the Court's April 15, 2014 Order granting the Joint Motion to Dismiss (ECF No. 35), the only pending issues in the Government Defendants' and Supervisor Defendants' Motion to Dismiss (ECF No. 26) are whether Plaintiffs' First Claim for violation of the law of nations is barred by sovereign immunity, and whether Plaintiffs' prayer for attorneys' fees should be dismissed as unrecoverable.

The Government Defendants contend that Plaintiffs' First Claim for violation of the law of nations cannot be maintained against the United States or its agencies because the United States has not waived its sovereign immunity for violations of international law. (ECF No. 26-1 at 11-16). Specifically, the Government Defendants contend that neither Alien Tort Statute ("ATS") nor any treaty or international declaration provides the explicit Congressional waiver required to effectively waive sovereign immunity. *Id.* at 11-15 The Government Defendants also contend that the Federal Tort Claims Act's ("FTCA") limited waiver of sovereign immunity does not apply to international-law based claims. *Id.* at 15-16.

Plaintiffs assert that the alleged shooting amounted to an extra-judicial killing, a *jus cogens*[4] violation of international law. (ECF No. 33 at 17-18). Plaintiffs contend that the United States and its agencies are "a fortiori" deprived of sovereign immunity for *jus cogens* violations because foreign officials and governments are not protected by foreign sovereign immunity under the ATS for *jus cogens* violations. *Id.* at 17-20.

---

[4] "As defined in the Vienna Convention on the Law of Treaties, a *jus cogens* norm, also known as a 'peremtory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.'" *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir. 1992) (citing Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

Plaintiffs rely on *Sosa v. Alvarez Machain*, 542 U.S. 692 (2004) for the propositions that: (1) violations of "specific, universal, and obligatory" international norms are actionable under the ATS; and (2) the very purpose of the ATS was to permit suits by non-U.S. citizens against U.S. officials acting in their official capacity, such that "no additional Congressional waiver of sovereign immunity was required." *Id.* at 20-26. Finally, Plaintiffs contend that sovereign immunity for an extrajudicial killing would be contrary to international law, citing Restatement (Third) of Foreign Relations Law § 711(a) (1987) and the European Convention of Human Rights, and the United States' own international obligations, citing the American Convention on Human Rights. *Id.* at 26-30. Plaintiffs contend that the *Charming Betsy* canon should be applied, that is, "the Court should not construe the ATS to conflict with international law absent an 'affirmative expression of congressional intent,'" by considering these international mandates. *Id.* at 31 (citing *Heong v. United States,* 112 U.S. 536, 540 (1884)).

The United States, as a sovereign, is immune from suit. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). "It is axiomatic that Congressional waiver of sovereign immunity is a prerequisite to any suit brought against the United States." *Roberts v. United States*, 498 F.2d 520, 525 (9th Cir. 1974). The United States "may not be sued without its consent and the terms of such consent define the court's jurisdiction." *Baker v. United States*, 817 F.2d 560, 562 (9th Cir. 1987). A waiver of sovereign immunity as contained in any statute "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). "A party bringing a cause of action against the federal government bears the burden of showing an unequivocal waiver of immunity." *Baker*, 817 F.2d at 562. A waiver of the sovereign immunity of the United States must be "unequivocally expressed." *Franconia Assoc. v. United States*, 536 U.S. 129, 141 (2002).

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The "[ATS] has been interpreted as

a jurisdiction statute only–it has not been held to imply any waiver of sovereign immunity." *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) (quoting *Goldstar (Panama) S.A. v. United States*, 967 F.2d 956, 968 (4th Cir. 1992)); *see also Koohi v. United States*, 976 F.2d 1328, 1333 n.4 (9th Cir. 1992); *Industria Panificadora S.A. v. United States*, 957 F.2d 886, 887 (D.C. Cir. 1992). Therefore, "any party asserting jurisdiction under the [ATS] must establish, independent of that statute, that the United States has consented to suit." *Tobar*, 639 F.3d at 1196.

The United States has not unequivocally expressed its consent to suit pursuant to the ATS. Controlling case law in this Circuit holds that the ATS does not waive sovereign immunity. *Tobar*, 639 F.3d at 1196. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) does not hold otherwise. In *Sosa*, the plaintiff, a Mexican physician, sued another Mexican national for abducting him and bringing him to the United States for his arrest. *Id.* at 698. The Supreme Court interpreted the ATS to permit private causes of action for a select few torts in violation of the law of nations that were "defined with a specificity comparable to the features of the 18th-century paradigms" of "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 724-25. *Sosa* does not address whether the United States may be sued pursuant to the ATS and does not hold that sovereign immunity is waived for a violation of the law of nations.

Plaintiffs have not established, "independent of [the ATS], that the United States has consented to suit." *Tobar*, 639 F.3d at 1196. The two treaties Plaintiffs rely on do not waive sovereign immunity. The American Convention on Human Rights has not been ratified. The International Covenant on Civil and Political Rights has been ratified by the Senate, "[b]ut that treaty is not self-executing and therefore 'did not itself create obligations enforceable in the federal courts.'" *Tobar*, 639 F.3d at 1196 (citing *Sosa*, 542 U.S. at 735).

The Court further concludes that the alleged *jus cogens* violation by the Government and Supervisor Defendants does not result in a waiver of, or exception to,

sovereign immunity.  The waiver must be "unequivocally expressed." *Franconia Assoc.*, 536 U.S. at 141.  In *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (1992), the Ninth Circuit recognized that a foreign state could lose its *foreign* immunity for committing a *jus cogens* violation because *jus cogens* norms have the "highest status under international law," and the principle of foreign sovereign immunity is itself a principle of international law.  *Id.* at 717-18.  However, Plaintiffs have cited no authority for the proposition that alleging a *jus cogens* violation waives the *domestic* sovereign immunity of the United States, a principle firmly rooted in *domestic law.*

Finally, the Court cannot apply the *Charming Betsy* canon, which provides that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804), to conclude that the ATS waives sovereign immunity for *jus cogens* violations.  First, although a *jus cogens* violation is a violation of the law of nations, *Siderman de Blake*, 965 F.2d at 714, no authority requires a waiver of sovereign immunity to remedy that *jus cogens* violation.  The international law sources cited by Plaintiffs stand for the general proposition that violations of international law committed by a state or its officials must be remedied by that state, but they do not require that a state consent to being sued directly.  In this case, Plaintiffs are not precluded by the doctrine of sovereign immunity from suing the Agent or Supervisor Defendants in their individual capacities.

Second, "the Supreme Court has never invoked *Charming Betsy* against the United States in a suit in which it was a party." *United States v. Corey*, 232 F.3d 1166, 1179 (9th Cir. 2000).  "The concerns that underlie the canon are 'obviously much less serious where the interpretation arguably violating international law is urged upon [the court] by the Executive Branch of our government.'  When the Executive Branch is the party advancing a construction of a statute with potential foreign policy implications, we presume that 'the President has evaluated the foreign policy consequences of such

an exercise of U.S. law and determined that it serves the interests of the United States.'"
*ARC Ecology v. U.S. Dept. Of Air Force*, 411 F.3d 1092, 1102 (9th Cir. 2005) (citing
*Corey*, 232 F.3d at 1179); *see also Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010)
(holding that because "Congress is not constrained by international law as it is by the
Constitution . . . 'we are bound by a properly enacted statute, provided it be
constitutional, even if that statute violates international law.'") (citing *Alvarez-Mendez
v. Stock*, 941 F.2d 956, 963 (9th Cir. 1991)).

Because Plaintiffs' First Claim is only asserted against the Government
Defendants, Plaintiffs fail to state a claim for "violation of the law of nations." *See
Balser v. Department of Justice, Office of U.S. Trustee*, 327 F.3d 903, 907 (9th Cir.
2003) ("In sovereign immunity analysis, any lawsuit against an agency of the United
States or against an officer of the United States in his or her official capacity is
considered an action against the United States."). Plaintiffs' First Claim is dismissed.

**IV. The Supervisor and Agent Defendants' Motion to Dismiss (ECF No. 27)**

Defendants Winkowksi, Aguilar, and McAleenan move to dismiss the FAC for
lack of personal jurisdiction. The Supervisor Defendants and Agent Nelson move to
dismiss all claims asserted against them for failure to statute a claim and based on
qualified immunity. The Supervisor Defendants and Agent Defendants move to dismiss
Plaintiffs' request for attorneys' fees.

**A.   Personal Jurisdiction and Plaintiffs' Motion for Leave to Conduct
Jurisdictional Discovery (ECF No. 31)**

Plaintiffs allege that Winkowski, Aguilar, and McAleenan were, at the time of
Yañez's death, the Assistant Commissioner of CBP in the Office of Field Operations,
the Acting Deputy Commissioner of CBP, and Deputy Assistant Commissioner of CBP
in the Office of Field Operations, respectively. Plaintiffs generally allege that each of
these defendants was responsible for implementing and approving of the Rocking
Policy responsible for Yañez's death, and each were responsible for knowing about the

1   Rocking Policy but failing to put a stop to it.

2        Defendants assert that Plaintiffs have made no attempt to connect these
3   Defendants' activities to the State of California.  Plaintiffs assert that they have made
4   a prima facie showing of specific jurisdiction by alleging that each Defendant was
5   responsible for training Border Patrol agents and was "responsible for approving and
6   implementing the . . . Rocking Policy."  (ECF No. 25 at 5-6).  Plaintiffs also submit
7   various exhibits in order to demonstrate each Defendant's contact with California and
8   request leave to conduct jurisdictional discovery.

9                        **i. 12(b)(2) Standard**

10       On a motion to dismiss a complaint for lack of personal jurisdiction, the plaintiff
11  bears the burden of establishing personal jurisdiction.  *Farmers Ins. Exch. v. Portage*
12  *La Prarie Mut. Ins. Co.,* 907 F.2d 911, 912 (9th Cir. 1990).  Where the motion to
13  dismiss is based on written materials rather than an evidentiary hearing, the plaintiff
14  need only make a prima facie showing of jurisdictional facts to satisfy this burden.
15  *Dole Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir. 2002).  While the plaintiff
16  cannot "simply rest on the bare allegations of its complaint," *Amba Mktg. Sys., Inc. v.*
17  *Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977), uncontroverted allegations in the
18  complaint must be taken as true.  *AT&T v. Campagnie Bruxelles Lambert,* 94 F.3d 586,
19  588 (9th Cir. 1996).  Conflicts between parties over statements contained in affidavits
20  must be resolved in the plaintiff's favor.  *Id.*; *see also Bancroft & Masters, Inc. v.*
21  *Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie
22  jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must
23  adopt [the plaintiff's] version of events for purposes of this appeal.").  "[I]f a plaintiff's
24  proof is limited to written materials, it is necessary only for these materials to
25  demonstrate facts which support a finding of jurisdiction in order to avoid a motion to
26  dismiss."  *Data Disc, Inc. v. Sys. Tech. Associates, Inc.,* 557 F.2d 1280, 1285 (9th Cir.
27  1977).

28

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution. *Pac. Atl. Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1327 (9th Cir. 1985). California's long-arm statute permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution of this state or the United States." Cal. Code Civ. Proc. § 410.10. Due process requires that the defendant have such "minimum contacts" with the forum state that the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1954). Under due process analysis, a defendant may be subject to either general or specific personal jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 (1984).

### ii.  General Jurisdiction

To exercise general jurisdiction over a non-resident defendant, the defendant must engage in "continuous and systematic" contacts that "approximate physical presence in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) (citations and internal quotations omitted).

Plaintiffs have failed to establish general personal jurisdiction over Defendants Winkowski, Aguilar, or McAleenan. Plaintiffs have failed to make a prima facie showing that any of these defendants reside in California or have ongoing activities in California.

### iii.  Specific Jurisdiction

The Ninth Circuit analyzes specific jurisdiction according to a three-prong test:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial

justice, i.e. it must be reasonable.

*Menken v. Emm,* 503 F.3d 1050, 1057 (9th Cir. 2007). Purposeful direction requires that the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

Plaintiffs have not made a prima facie showing that Defendants Winkowski, Aguilar, or McAleenan are subject to specific personal jurisdiction in California. Plaintiffs allege, in introducing Winkowski, Aguilar, and McAleenan, that they were responsible for implementing a Rocking Policy at the Southern Border. However, the factual allegations of the FAC state that these defendants were responsible for failing to put a stop to the Rocking Policy after they became aware of it. The FAC's general allegations of these federal officers' supervisory responsibilities and alleged implementation of the Rocking Policy, without more, do not satisfy Plaintiffs' prima facie burden to satisfy the purposeful direction test. *See Menken,* 503 F.3d at 1057; *see also Hill v. Pugh*, 75 Fed. App'x 715, 719 (10th Cir. 2003) (unpublished) (holding that the allegation that two high-ranking Federal Bureau of Prisons officials "have overall responsibility for Bureau of Prisons' operations in Colorado" was insufficient to satisfy the purposeful availment test); *Munns v. Clinton*, 822 F. Supp. 2d 1048, 1078 (E.D. Cal. 2011) ("[A]llegations limited to national policy implementation and oversight are insufficient to support a finding of personal jurisdiction because a contrary finding would essentially subject the [high-ranking State Department officials] to personal liability in every state in the Union regardless of how tenuous their actual contacts with a particular forum might be."). Additionally, these federal officers' alleged omissions—failures to train, supervise, and prevent or correct the use of the Rocking Policy—are not "intentional act[s] ... expressly aimed at the forum state." *Yahoo!*, 433 F.3d at 1206.

**iv. Leave to Conduct Jurisdictional Discovery**

A district court has discretion to permit or deny jurisdictional discovery. *Boschetto v. Hansing,* 539 F.3d 1011, 1020 (9th Cir. 2008). "Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* A district court may deny jurisdictional discovery "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants . . . ." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quotation omitted).

The Court finds that jurisdictional discovery is inappropriate at this time. Because neither the allegations of the FAC nor the evidence of Defendant Winkowksi, Aguilar, and McAleenan's past activities in California make a prima facie showing of a "continuous and systematic" presence, it is wholly speculative that discovery will lead to evidence necessary to establish *general* jurisdiction. *Boschetto*, 539 F.3d at 1020 ("The denial of [the plaintiff's] request for discovery, which was based on little more than a hunch that it might yield jurisdictionally relevant facts, was not an abuse of discretion."). Whether the Court may exercise *specific* jurisdiction over these Defendants will depend on whether Plaintiffs can allege forum-related activity giving rise to their claims. Jurisdictional discovery is not necessary to accomplish this task.

### v. Conclusion

The Motion to Dismiss Defendants Winkowski, Aguilar, and McAleenan for lack of personal jurisdiction (ECF No. 27) is granted. The Motion for Leave to Conduct Jurisdictional Discovery (ECF No. 31) is denied.

### B. Failure to State a Claim and Qualified Immunity

Defendants contend that all Defendants are entitled to qualified immunity on all of Plaintiffs' Claims except for Plaintiffs' Fourth Amendment Claim against Agent Diaz. Specifically, Defendants contend that Plaintiffs have failed to allege sufficient facts to establish supervisory liability against any Supervisor Defendant, Plaintiffs have failed to allege a viable secondary liability theory against Agent Nelson, and Plaintiffs

have failed to allege the violation of clearly established rights under the Due Process and Equal Protection Clauses.

### i. 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pac. Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

Where government officials are sued in their individual capacities for civil damages, a court must "begin by taking note of the elements a plaintiff must plead to state a claim . . . against officials entitled to assert the defense of qualified immunity." *Iqbal*, 556 U.S. at 675. Government officials are entitled to qualified immunity unless the plaintiff can allege the violation of a "clearly established" constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

**ii. Fourth Amendment Unreasonable Seizure (Fourth and Fifth Claims)**

**a. Supervisor Defendants (Fourth Claim)**

Plaintiffs' Fourth Claim is brought against the Supervisor Defendants in their individual capacities. Plaintiffs allege that each and every Supervisor Defendant violated Yañez's Fourth Amendment rights by "personally developing, authorizing, and conspiring to effect, and permitting and directing their subordinates to implement, the Rocking Policy" and by "failing to establish adequate procedures to train the Border patrol agents, failing to establish adequate disciplinary procedures and adequate procedures to investigate agents' misconduct, and acting and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force." (ECF No. 25 at 44).

Defendants contend that Plaintiffs cannot maintain suit against the Supervisor Defendants by alleging their knowledge and acquiescence to the alleged unconstitutional conduct. Defendants assert that Plaintiffs have failed to allege the specific roles of each Defendant beyond their general responsibilities within DHS, such as how each became aware of the Rocking Policy.

Plaintiffs contend that allegations of "deliberate indifference" or "knowledge and acquiescence" are sufficient to state *Bivens* violations. (ECF No. 32 at 17). Plaintiffs assert that all of the public information alleged in the FAC reasonably gives rise to the inference that each Supervisor Defendant was aware of the Rocking Policy, and that they have alleged the specific knowledge of Defendants Napolitano and Fisher.

"A defendant may be held liable as a supervisor under § 1983 [or *Bivens*] 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)); *see also id.* at 1206-08 (explaining that "a *Bivens* action is the federal analog to an action against state or local officials

under § 1983").  "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).  For a Fourth Amendment claim premised on supervisory liability, a plaintiff must allege facts demonstrating that a reasonable supervisor in the defendant's shoes would have found his own conduct to be "clearly unlawful."  *Chavez v. U.S.*, 683 F.3d 1102, 1110 (9th Cir. 2012).

Plaintiffs' allegations of each Supervisor Defendant's supervisory institutional role do not, without more, permit an inference of knowledge of the Rocking Policy.  *See Moss v. U.S. Secret Serv.*, 711 F.3d 941, 968 (9th Cir. 2012), *rev'd on other grounds sub nom. Wood v. Moss*, 134 S. Ct. 2056 (2014) (holding that the allegation that the "'Superintendent of the Oregon State Police' was 'responsible for directing the operations of the Oregon State Police and supervising law enforcement officers'" was insufficient to state a claim for supervisory liability); *Chavez*, 683 F.3d at 1110-11 (holding that allegations of supervisory roles are insufficient to infer supervisor's knowledge of the allegedly unconstitutional activities of subordinates).  Plaintiffs have alleged in detail several instances of border shootings related to alleged rock throwing and detailed public debate on the Border Patrol's use of lethal force in response to rock throwing, including statements by the NBPC.  These allegations make it possible that some or all of the Supervisor Defendants were aware of the alleged Rocking Policy, but "the non-specific allegations in the complaint regarding [each Supervisor Defendant's individual involvement] fail to nudge the *possible* to the *plausible*, as required by *Twombly*."  *al-Kidd v. Ashcroft*, 580 F.3d 949, 979 (2009), *rev'd on other grounds*, 131 S. Ct. 2074 (2011); *see also Hydrick v. Hunter*, 669 F.3d 937, 942 (2012) (complaint must allege facts demonstrating that each supervisor was personally responsible for the alleged constitutional violation).

Plaintiffs only make specific factual allegations as to Defendants Napolitano and

Fisher.  As to Defendant Napolitano, the report that the Mexican Attorney General complained to her of excessive force used in one instance is not sufficient to plausibly put her on notice of the alleged Rocking Policy.[5]  *al-Kidd*, 580 F.3d at 979.  This allegation alone is insufficient to state a claim against Defendant Napolitano on a supervisory liability theory.

As to Defendant Fisher, the article incorporated by reference in the FAC begins by reporting that "Border Patrol agents will be allowed to continue using deadly force against rock-throwers, [Defendant Fisher] said, despite the recommendation of a government-commissioned review to end the practice."  *Associated Press Exclusive: Border Patrol Rejects Curbs on Force* (November 5, 2013), *available at* http://bigstory.ap.org/article/ap-exclusive-border-patrol-rejects-curbs-force.  The incorporated article permits the inference that Defendant Fisher knew of and was responsible for the alleged Rocking Policy.  Although the article post-dates Yañez's death, Plaintiffs have alleged that Defendant Fisher has served as the Chief of the Border Patrol since May 2010, and have set forth facts to permit the inference that the alleged Rocking Policy existed for the entirety of Defendant Fisher's tenure.  This individualized factual allegation is sufficient to state a claim against Defendant Fisher.

The Court concludes that Plaintiffs have failed to allege sufficient facts to state a Fourth Amendment claim against all Defendants except Fisher.  The Motion to Dismiss the Fourth Claim as to Defendant Fisher is denied.  The Motion to Dismiss the Fourth Claim as to all other Supervisor Defendants is granted.

### b.  Agent Nelson (Fifth Claim)

The FAC alleges that:

According to Agent Nelson, at about the time that Yañez allegedly threw

---

[5]  The article incorporated by reference states that, in response to the shooting of a Mexican teenager near El Paso, "[Mexican] Attorney General Fernando Gomez Mont told Homeland Security head Janet Napolitano that 'the unjustified use of force against our population is unacceptable to the Mexican government.'" Laura Carlsen, *Lethal Force on the Border*, Huffington Post, June 18, 2010, *available at* http://www.huffingtonpost.com/laura-carlsen/lethal-force-on-the-borde_b_617065.html.

the board, Diaz arrived to help subdue Murrieta.  Agent Diaz allegedly told Yañez to get off the fence, and then began helping Agent Nelson get control of Murrieta.... Agent Nelson acknowledges then, without any warning and any further alleged throwing of a rock or a board by Yañez, Agent Nelson pulled away from the scuffle with Murrieta. Agent Diaz removed his sidearm from its holster, uttered not a single additional word, and shot Yañez in the head.

(ECF No. 25 at 12).  The FAC further alleges that, according to Murrieta:

[B]oth Agent Nelson and Agent Diaz had Murrieta down on the ground and were beating him. Agents Nelson and Diaz easily outweighed and outmuscled the slight-framed Murrieta, who was facedown in the dirt road. In fact, when Murrieta was eventually taken away by a cadre of Border Patrol agents, he was disoriented and his mouth was covered with his own blood.... While Agents Nelson and Diaz had Murrieta on the ground and were beating him, Yañez climbed into the tree on the south side of the primary fence and tried to dissuade Agents Nelson and Diaz from continuing the beating.... In an apparent effort to stop the attack, Yañez yelled that he was going to use his cellphone to take video and pictures of the beating. Upon hearing Yañez's threat to record the Agents' attack on Murrieta, Agent Diaz stopped beating Murrieta, stood up, and, without warning or provocation, shot Yañez in the head.

*Id.* at 14.  Plaintiffs' Fifth Claim alleges, in pertinent part:

Agent Nelson is also liable for this constitutional violation because he witnessed this illegal conduct but took no action to protect Yañez, ratified Agent Diaz's illegal conduct after it had occurred, and/or conspired with Agent Diaz to commit and/or cover-up this illegal conduct.... [t]he Agents were aware of the danger and risk of serious harm or death that Yañez and others faced as a result of their use of excessive force. The Agents nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Yañez's death. Yañez's death was a foreseeable result of the Agents' actions and omissions.

*Id.* at 44-45.

Agent Nelson contends that the FAC does not allege the violation of a clearly established constitutional right based on a viable theory of secondary liability.  Agent Nelson asserts that Plaintiffs have not alleged sufficient facts plausibly demonstrating a conspiracy between him and Agent Diaz.  Agent Nelson also asserts that he could not have provoked and therefore proximately caused the shooting of Yañez absent an underlying constitutional violation.  Finally, Agent Nelson asserts that there was not enough time for him to intervene.

Plaintiffs assert that the FAC does allege that the Agents conspired to beat

Murrieta, and it was foreseeable to Nelson that Agent Diaz would shot Yañez in furtherance of the conspiracy.  Plaintiffs contend that the beating of Murrieta was unconstitutional and that this "unconstitutional provocation is the proximate cause of the subsequent application of deadly force" used on Yañez.  (ECF No. 32 at 35).  Finally, Plaintiffs contend that the FAC is silent as to the amount of time that elapsed between Agent Diaz leaving the scuffle with Murrieta and shooting Yañez.

## I. Conspiracy

To establish defendants' liability for conspiracy, "a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Envtl. Ctr. v. Mendocino Cnty*, 192 F.3d 1283, 1301 (9th Cir. 1999) (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989)) (internal quotations omitted).  "The defendants must have, by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." *Id.* (citing *Gilbrook v. City of Westminister*, 177 F.3d 839, 856 (9th Cir. 1999)).  "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only be rarely available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action."  *Id.* at 1302.  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  *United Steelworkers of Am.*, 865 F.2d at 1541.  To establish that the conspiracy was the cause of the plaintiff's injuries, "the requisite causal chain can occur through the 'setting in motion [of] a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'"  *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997) (citing *Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978)).

Although the FAC alleges that Agent Nelson "conspired with Agent Diaz to commit and/or cover-up this illegal conduct," (ECF No. 25 at 45), the FAC does not specify what "illegal conduct" the agents conspired to commit.  It therefore fails to state

a crucial element of a conspiracy claim and fails to put Defendants on notice of what wrongdoing the claim is premised on.  *See Jones v. Cmty. Redevelopment Agency of Los Angeles*, 733 F.2d 646,649 (9th Cir. 1984) ("[A] pleading must give[ ] fair notice and state[ ] the elements of the claim plainly and succinctly.") (internal quotations omitted). The FAC fails to state a Fourth Amendment claim against Agent Nelson for conspiring to violate Yañez's Fourth Amendment rights.

## II.  Unconstitutional Provocation

"[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force."  *Billington v. Smith*, 292 F.3d 1177, 1189 (2002).  The application of deadly force, even if it is by itself reasonable, is rendered "*unreasonable* as a matter of law" because was proximately caused by the "initial unconstitutional provocation."  *Id.* at 1190-91.

The FAC does not allege that Yañez was provoked, who provoked Yañez, or what Fourth Amendment violation provoked Yañez, all essential elements of an unconstitutional provocation claim.  *See Jones*, 733 F.2d at 649.

Even if the FAC put Defendants on notice that Plaintiffs were proceeding on an unconstitutional provocation claim, the FAC does not allege sufficient facts to make such a claim plausible.  Under Murrieta's version of events, Agent Diaz's shooting of Yañez was done "without warning or *provocation*."  (ECF No. 25 at 14) (emphasis added).  Under Agent Nelson's version of events, there is not alleged to have been any unconstitutional activity prior to the shooting of Yañez.  The Court concludes that the FAC does not state a Fourth Amendment claim against Agent Nelson on a provocation theory.

## III.  Failure to Intervene

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  *United States v. Koon*, 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).  "Importantly,

however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

Plaintiffs allege that Diaz, "pulled away from the scuffle with Murrieta . . . removed his sidearm from its holster, uttered not a single additional word, and shot Yanez in the head." (ECF No. 25 at 12). On these facts, Agent Nelson had no opportunity to intervene because he was in the middle of a scuffle with Murrieta, and he was given no indication from Agent Diaz that deadly force would be used. Plaintiffs have failed to state a Fourth Amendment claim against Agent Nelson for failing to intervene.

## IV. Conclusion

The Motion to Dismiss Plaintiffs' Fifth Claim as against Nelson is granted. Plaintiffs have not stated a plausible secondary liability claim against Agent Nelson for the shooting of Yañez.

### iii. Fifth Amendment Due Process (Claims Two and Three)

Plaintiffs' Second and Third Claims, brought under the Due Process Clause against the Supervisor and Agent Defendants, respectively, mirror their Fourth Amendment claims. Defendants contend that excessive force claims in the context of a seizure are governed solely by the Fourth Amendment, barring any Due Process claims in this case. Defendants further contend that any rights conferred by the Due Process Clause in this instance are not "clearly established." (ECF No. 27-1 at 23-24). Plaintiffs contend that this limitation, as established by *Graham v. Connor*, 490 U.S. 386 (1989), does not apply to this case because Yañez is not a citizen, and it is plausible under the facts alleged that Yañez was not seized.

"Violation of the Fourth Amendment [right to be free from unreasonable seizures] requires an intentional acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). An officer's intent or motive in applying force is of no importance. *Nelson v. City of Davis*, 685 F.3d 867, 877 (9th Cir. 2012). Instead, "[t]he

intentionality requirement is satisfied when the 'termination of freedom of movement [occurs] *through means intentionally applied*.'"  *Id.* at 876 (citing *Brower*, 489 U.S. at 597) (emphasis in original).  It is sufficient, but not necessary, that a "person be stopped by the very instrumentality set in motion or put in place in order to achieve that result."  *Brower*, 489 at 599.  "Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment..."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).

Plaintiffs have failed to state a viable Due Process Claim as to any defendant. Regardless of Agent Diaz's subjective motivation in shooting Yañez, Plaintiffs allege Agent Diaz intentionally shot and killed Yañez.  Yañez's freedom of movement was unquestionably restrained.  Because Plaintiffs have alleged a seizure, their excessive force claims are "most properly characterized as [claims] invoking the protections of the Fourth Amendment."[6]  *Id.* at 394.

The Motion to Dismiss Plaintiffs' Second and Third Claims is granted as to all Defendants.

### iv.  Fifth Amendment Equal Protection (Claims Six and Seven)

Plaintiffs allege that the Rocking Policy reflects intentional discrimination "against Yañez and others on the basis of their Hispanic descent and perceived Mexican origin," and is "one part of a broader U.S. effort to 'get tough' on unauthorized immigration by persons of Hispanic descent and Mexican nationality." (ECF No. 25 at 35).  Plaintiffs allege that this practice is discriminatory because there  is no such policy implemented at the Northern Border, no other law enforcement agencies in the country have adopted a policy like the Rocking Policy, and Defendants would not execute such a policy against Canadians or Caucasians.  As to the Agent Defendants,

---

[6] *Graham*'s requirement that excessive force claims be brought under the Fourth Amendment is not limited to U.S. citizens.  The Court used the term "free citizen" to distinguish from the prison context, where the Eighth Amendment also protects against physical abuse.  *Graham*, 490 U.S. at 394-95.

1   Plaintiffs allege that excessive force was used solely because of his "race, ethnicity,
2   and/or perceived national origin." *Id.* at 47.

3       Defendants contend that the discrimination allegations are conclusory and do not
4   give rise to an inference of discriminatory intent.  As to the Supervisor Defendants,
5   Defendants contend that allegations of mere knowledge or acquiescence are insufficient
6   to state an Equal Protection claim premised on supervisory liability.  Plaintiffs do not
7   contend that knowledge or acquiescence is sufficient to state a claim, but instead
8   contend that the Rocking Policy was implemented with racial animus.

9       "Where the claim is invidious discrimination in contravention of the First and
10  Fifth Amendments . . . the plaintiff must plead and prove that the defendant acted with
11  discriminatory purpose." *Iqbal*, 556 U.S. at 676.  "[P]urposeful discrimination requires
12  more than 'intent as volition or intent as awareness of consequences.'" *Id.* at 677.  For
13  an Equal Protection claim premised on supervisory liability, a plaintiff must "plead
14  sufficient factual matter to show that [a defendant] adopted and implemented the ...
15  policies at issue not for a neutral ... reason but for the purpose of discriminating on
16  account of race, religion, or national origin." *Id.* at 677.

17      The conclusory allegation that the Rocking Policy was implemented and carried
18  out on persons "on the basis of their Hispanic descent and perceived Mexican origin"
19  is not entitled to an assumption of truth.  The same is true for the allegation that the
20  Agents shot Yañez "on the basis of his Hispanic descent and Mexican origin."
21  Although the FAC alleges that the Rocking Policy is only carried out along the Souther
22  Border and only against Mexicans and persons of Hispanic descent, there is an "obvious
23  alternative explanation" for this perceived discrimination. *Iqbal*, 556 U.S. at 682.  On
24  the facts alleged, "[i]t should come as no surprise that a ... policy directing [Border
25  Patrol agents to treat instances of rock throwing at the Souther Border as deadly force]
26  would produce a disparate, incidental impact on [Mexican nationals and persons of
27  Hispanic descent], even though the purpose of the policy was to target neither [Mexican
28  nationals or persons of Hispanic descent]." *Id.*  The Court concludes that Plaintiffs have

failed to state an Equal Protection claim for intentional discrimination.

The Motion to Dismiss Plaintiffs' Sixth and Seventh Claims is granted.

**V.  Motions to Dismiss Request for Attorneys' Fees as Unrecoverable (ECF Nos. 26, 27)**

Defendants contend that Plaintiffs are not entitled to attorneys' fees in a *Bivens* action.  Plaintiffs contend that striking the request is premature at the motion to dismiss stage.

The Motion to Dismiss Plaintiffs' prayer for attorneys' fees is denied as premature.  *See Nurse v. U.S.*, 226 F.3d 996, 1005 (9th Cir. 2000) (reversing order denying fees as "premature" because "this litigation is in its early stages," despite the fact that "appellant has not justified her prayer for attorney's fees relating to her *Bivens* claims").

**VI.  Conclusion**

IT IS HEREBY ORDERED that the Order on the Joint Motion to Dismiss (ECF No. 34) is AMENDED as follows.  Plaintiff's Second, Fourth, and Sixth Claims for relief are DISMISSED WITH PREJUDICE as to DHS.

IT IS FURTHER ORDERED that the Government Defendants' and Supervisor Defendants' Motion to Dismiss (ECF No. 26) is GRANTED in part and DENIED in part.  Plaintiffs' First Claim for violation of the law of nations is DISMISSED.  The Motion to Dismiss Plaintiffs' prayer for attorneys' fees is DENIED.

IT IS FURTHER ORDERED that the Supervisor Defendants and Agent Defendants' Motion to Dismiss (ECF No. 27) is GRANTED in part and DENIED in part.  The Motion to Dismiss Defendants Aguilar, McAleenan, and Winkowski for lack of personal jurisdiction is GRANTED.  Plaintiff's Second, Third, Sixth and Seventh Claims for Due Process and Equal Protection violations are DISMISSED without prejudice.  Plaintiff's Fourth Claim is DISMISSED without prejudice as to Defendants Napolitano, Bersin, Beeson, Barlow, and Scott.  The motion is DENIED to the extent it seeks dismissal of Defendant Fisher from Plaintiff's Fourth Claim.  Plaintiffs' Fifth

1    Claim is DISMISSED without prejudice as to Agent Nelson. The Motion to Dismiss

2    Plaintiffs' prayer for attorneys' fees is DENIED.

3         IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to Conduct

4    Jurisdictional Discovery (ECF No. 31) is DENIED.

5         No later than thirty (30) days from the date this Order is filed, Plaintiffs may file

6    a motion for leave to amend the First Amended Complaint, accompanied by a proposed

7    second amended complaint.

8    DATED:  September 3, 2014

9                                    _William Q. Hayes_____

10                                   **WILLIAM Q. HAYES**
                                     United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28