1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  MARIA DEL SOCORRO QUINTERO              CASE NO. 13cv1417-WQH-
    PEREZ, C.Y., a Minor, and B.Y., a       BGS
12  Minor,
                                            ORDER
13                            Plaintiffs,

14          vs.

    UNITED STATES OF AMERICA,
15  UNITED STATES DEPARTMENT
    OF HOMELAND SECURITY,
16  UNITED STATES CUSTOMS AND
    BORDER PROTECTION OFFICE OF
17  BORDER PATROL, JANET
    NAPOLITANO, THOMAS S.
18  WINKOWSKI, DAVID AGUILAR,
    ALAN BERSIN, KEVIN K.
19  McALEENAN, MICHAEL J.
    FISHER, PAUL A. BEESON,
20  RICHARD BARLOW, RODNEY S.
    SCOTT, CHAD MICHAEL NELSON,
21  and DORIAN DIAZ, and DOES 1-50,

22                            Defendants.

23  HAYES, Judge:

24          The matter before the Court is the Motion to Dismiss Plaintiffs' Second Amended

25  Complaint filed by Defendants Janet Napolitano, Alan Bersin, David Aguilar, Michael

26  Fisher, and Chad Nelson.  (ECF No. 65).

    **I. Background**
27
            On June 17, 2013, Plaintiffs Maria Del Socorro Quintero Perez, the widow of
28

Jesus Alfredo Yañez Reyes ("Yañez"), and CY and BY, the minor children of Yañez, commenced this action, seeking damages for the death of Yañez, as well as declaratory relief. (ECF No. 1). On January 2, 2014, Plaintiffs filed the First Amended Complaint ("FAC"). (ECF No. 25). The FAC asserted the following claims for relief: (1) violation of the law of nations against the Government Defendants[1]; (2) violation of the Fifth Amendment's Due Process Clause against the Government Defendants and Supervisor Defendants[2]; (3) violation of the Fifth Amendment's Due Process Clause against the Agent Defendants[3]; (4) violation of the Fourth Amendment's prohibition against unreasonable seizures against the Government Defendants and Supervisor Defendants; (5) violation of the Fourth Amendment's prohibition against unreasonable seizures against the Agent Defendants; (6) violation of Fifth Amendment equal protection against the Government Defendants and Supervisor Defendants; (7) violation of Fifth Amendment equal protection against the Agent Defendants; and (8) Declaratory Relief regarding the judgment bar provision of the Federal Tort Claims Act ("FTCA").

On February 18, 2014, the Government Defendants and Supervisor Defendants sued in their official capacities filed a motion to dismiss the FAC. (ECF No. 26). On February 18, 2014, the Supervisor Defendants sued in their individual capacities and

---

[1] The Government Defendants are the United States of America, United States Department of Homeland Security ("DHS"), and United States Customs and Border Protection ("CBP") Office of Border Patrol ("Border Patrol").

[2] The Supervisor Defendants are Janet Napolitano, Secretary of DHS from January 21, 2009 through September 6, 2013; Thomas S. Winkowski, Acting Commissioner of CBP from March 30, 2013 until March 7, 2014; David Aguilar, Chief of Border Patrol from 2004 until 2010, Deputy Commissioner of CBP from April 2010 until December 2011, and Acting Commissioner of CBP from December 2011 until February 8, 2013; Alan Bersin, Commissioner of CBP from March 2010 through December 2011; Kevin K. McAleenan, Acting Deputy Commissioner of CBP from March 2013 to present; Michael J. Fisher, Chief of Border Patrol from May 2010 to present; Paul A. Beeson, Chief Border Patrol Agent of the Border Patrol's San Diego Sector from November 2010 to the present; Richard Barlow, Acting Chief Patrol Agent of the Border Patrol's San Diego Sector from 2009 to November 2010; and Rodney S. Scott, Acting Deputy Chief Patrol Agent or the Deputy Chief Patrol Agent of the Border Patrol's San Diego Sector from May 2010 to the present.

[3] The Agent Defendants are Chad Nelson and Dorian Diaz.

Border Patrol Agents Dorian Diaz and Chad Nelson filed a motion to dismiss. (ECF No. 27). On September 3, 2014, the Court issued an Order granting in part and denying in part the motions to dismiss. (ECF No. 43). The Court dismissed the FAC as to Defendants Aguilar, McAleenan, and Winkowski for lack of personal jurisdiction. The Court dismissed Plaintiffs' first claim for violation of the law of nations, second claim and third claims for violations of the Fifth Amendment's Due Process Clause, sixth and seventh claims for violations of Fifth Amendment equal protection, fourth claim for violation of the Fourth Amendment (as to all defendants except Defendant Fisher), and fifth claim for violation of the Fourth Amendment (as to Defendant Nelson only).

On October 2, 2014, Defendant Fisher filed a motion for reconsideration of the Court's September 3, 2014 Order. (ECF No. 48). On November 25, 2014, Plaintiffs filed the Second Amended Complaint ("SAC"), which is the operative pleading. (ECF No. 61). On December 10, 2014, the Court issued an order denying the motion for reconsideration as moot. (ECF No. 64).

On December 16, 2014, Defendants Napolitano, Bersin, Aguilar, Fisher, and Nelson filed the Motion to Dismiss Plaintiffs' Second Amended Complaint and a request for judicial notice. (ECF Nos. 65-66). On January 5, 2015, Plaintiffs filed an opposition and a response to the request for judicial notice. (ECF Nos. 71-72). On January 12, 2015, Defendants filed a reply. (ECF No. 74).

## II. Allegations of the SAC

> At dusk on June 21, 2011, Yañez and Jose Ibarra-Murietta ("Murietta") crossed the border from Mexico to the United States together. Their crossing began in the Castillo neighborhood of Ciudad Tijuana. The duo squeezed through a small hole in the primary border fence that abutted the Castillo neighborhood, and emerged into a dried-out concrete culvert between the primary border fence (the corrugated solid metal fence closest to Mexico) and the secondary border fence (the high-tech chain link fence closest to the United States). The culvert runs north from the primary fence to Stuart's Bridge, which abuts the secondary fence.

(ECF No. 61 at 11).

"Murietta led the pair and was the first to traverse the length of the culvert and climb out at Stuart's Bridge. There, he encountered Border Patrol Agent Nelson." *Id.*

at 12. "Agent Nelson arrived at Stuart's Bridge in response to Border Patrol Agent Diaz's radio call requesting backup to apprehend Yañez and Murietta. Upon seeing Agent Nelson, Murietta leapt back into the culvert and began scaling a pole up the side of Stuart's Bridge." *Id.* "Agent Nelson, who had chased Murietta into the culvert, yelled to Agent Diaz, who was already at the top of Stuart's Bridge, to cut off Murietta's escape." *Id.* "Murietta saw Agent Diaz above him and descended back into the culvert where Agent Nelson waited." *Id.* "Yañez, who had stayed in the culvert near the primary fence, escaped back to Mexico through the small hole in the fence, fearing for his life." *Id.*

"Back on the ground at Stuart's Bridge, Murietta evaded Agent Nelson and ran south toward the primary fence where Yañez had just escaped. Agent Nelson caught Murietta in the culvert close to the primary fence." *Id.* "After grappling for a short time, Murietta escaped Agent Nelson's hold, climbed out of the culvert, and ran east down a dirt road that is parallel to the primary fence but separated from it by a wide swath of grass. Agent Nelson gave chase, running parallel and to the south of Murietta." *Id.* "Murietta and Agent Nelson began grappling again in the dirt road, and Agent Nelson swept Murietta's legs and wrestled him to the ground. Agent Nelson then admittedly began to strike Murietta while pinning him to the ground." *Id.*

"Meanwhile, Yañez had run parallel to Agent Nelson and Murietta on the southern side of the primary fence. When Murietta fell and Agent Nelson began to subdue him, Yañez, fearful that he might be the next victim of the Agents' aggression, climbed into a tree that leaned against the southern side of the primary fence near the area where Agent Nelson and Murietta were grappling in the road." *Id.* at 13.

> At this point, witnesses' versions of the critical events differ sharply. The Agents assert that during Nelson's struggle with Murietta, Yañez threw two rocks (per Agent Nelson) or one or possibly two rocks (per Agent Diaz) at Agent Nelson. The Agents acknowledge, however, that when Yañez was allegedly throwing the rock(s), he was wedged into the tree on the southern side of the primary fence. The Agents admit that the rock(s) was somewhere between the size of a golf ball and a baseball. The Agents further acknowledge that the alleged rock(s) did not hit Agent Nelson or anyone else.

*Id.* "The Agents apparently further assert that, while Agent Nelson and Murietta struggled on the ground, Yañez threw a nail-studded board that struck Agent Nelson in the head, glancing off his hat. Agent Nelson was not injured by this alleged board." *Id.* "According to Agent Nelson, at about the time that Yañez allegedly threw the board, Diaz arrived to help subdue Murietta. Agent Diaz allegedly told Yañez to get off the fence, and then began helping Agent Nelson get control of Murietta." *Id.*

"Agent Nelson acknowledges that then, without any warning to Yañez and any further alleged throwing of a rock or a board by Yañez, Agent Nelson [sic] pulled away from the scuffle with Murietta. Agent Diaz removed his sidearm from its holster, uttered not a single additional word, and shot Yañez in the head." *Id.* at 13.

At the time Agent Diaz shot Yañez, Yañez had "allegedly raised his hand as if to begin a throwing motion" but "Agent Diaz did not see any rock or anything else in Yañez's hand, which Agent Diaz acknowledges was closed into a fist." *Id.* at 14.

"Murietta's account of the events that evening differs markedly from those of the Agents with respect to the specific circumstances surrounding Agent Diaz's shooting of Yañez." *Id.* at 15. "Murietta asserts that Yañez never threw anything at Nelson or anyone else. Indeed, the shape and height of the tree, the height of the primary fence, and the distance of the tree and the fence from Agent Nelson made it impossible for Yañez (or any person) to throw rocks or wood at the agents with lethal force or accuracy." *Id.*

"Instead, both Agent Nelson and Agent Diaz had Murietta down on the ground and were beating him. Agents Nelson and Diaz easily outweighed and outmuscled the slight-framed Murietta, who was facedown in the dirt road. In fact, when Murietta was eventually taken away by a cadre of Border Patrol agents, he was disoriented and his mouth was covered with his own blood." *Id.*

"While Agents Nelson and Diaz had Murietta on the ground and were beating him, Yañez climbed into the tree on the south side of the primary fence, fearing that he would be next, and tried to dissuade Agents Nelson and Diaz from continuing the

beating." *Id.* at 15-16. "In an apparent effort to stop the attack, Yañez felt compelled to yell that he was going to use his cellphone to take video and pictures of the beating. Upon hearing Yañez's response to the Agents' attack on Murietta, Agent Diaz stopped beating Murietta, stood up, and, without warning to Yañez or without any kind of provocation from Yañez that would justify Agent Diaz's use of deadly force, shot Yañez in the head." *Id.* at 16.

"A sufficient amount of time elapsed between Agent Diaz standing up from the scuffle with Murietta and Agent Diaz shooting Yañez for Agent Nelson to intervene and stop the shooting." *Id.* at 13-14. "Agent Nelson conspired with Agent Diaz to unlawfully beat Murietta and unlawfully provoke Yañez to respond to this beating either by throwing objects at Agent Nelson or threatening to record the beating with a cell phone. In commission and in furtherance of that conspiracy, Agent Diaz shot Yañez, a result that Agent Nelson knew, or should have known, would occur." *Id.* at 14. "Agent Nelson further unlawfully provoked Yañez to respond to the Agents' beating of Murietta either by throwing objects at Agent Nelson or threatening to record the beating with a cell phone. As a result of that provocation, Agent Diaz shot Yañez, a result that Agent Nelson knew, or should have known, would occur." *Id.*

> Yañez was killed as a result of the United States Border Patrol's so-called "Rocking Policy." Pursuant to the Rocking Policy, Border Patrol agents along the nation's southern border deem the throwing of rocks at them by persons of Hispanic descent and presumed Mexican nationality to be per se lethal force to which the agents can legitimately respond with fatal gunfire. Under the Rocking Policy, Border Patrol agents shoot to kill Mexican nationals who allegedly throw rocks at them, regardless of whether the alleged rock-throwing poses an imminent risk of death or serious injury to the agents or anyone else, and regardless of whether other, non-lethal means are available to avert any such risk. In recent years, Border Patrol agents acting pursuant to the Rocking Policy have shot and killed at least thirteen persons and have seriously injured more. The Rocking Policy has the imprimatur of the highest officials of the Department of Homeland Security and the Customs & Border Protection Agency.

*Id.* at 2-3.

The Government Defendants and Supervisors knew or should have known, at all relevant times, that the Rocking Policy was being carried by Border Patrol agents along

the southern border who "regularly used excessive, lethal force against persons of perceived Hispanic descent and Mexican nationality." *Id.* at 19. "Each Supervisor Defendant in fact knew of, approved, and implemented the unlawful Rocking Policy." *Id.* at 20. The Supervisor Defendants' knowledge and acquiescence of the Rocking Policy is evinced by their knowledge of "a whole series of unlawful Border Patrol killings," public statements made by Border Patrol agents' representatives that throwing rocks is per se lethal force, "the U.S. Department of Justice's conclusion that an agent's shooting of an unarmed and unthreatening teenager was consistent with Border Patrol policy and training," the Supervisor Defendants' rejection of entreaties from numerous human rights organization "deploring the Rocking Policy," Defendants rejecting a report they had commissioned that concluded that the Rocking policy was unlawful and should be eliminated, and "admissions by a high-ranking CBP internal affairs official that Defendants knew of and condoned Border Patrol agents' unlawful use of excessive force." *Id.* at 20.

The SAC alleges that there were at least ten instances prior to Yañez's death where Mexican nationals were shot by Border Patrol agents in response to alleged rock throwing. The SAC alleges that, in some of these instances, a Mexican national was shot while attempting to flee. The SAC alleges that, in other instances, the rock-throwing allegations turned out to be false. For example, "[i]n 2003, Border Patrol agents killed Ricardo Olivares Martinez by shooting him five times as he attempted to flee. Agents alleged he was throwing rocks." *Id.* at 22. "[E]ach Supervisor Defendant knew of the facts underlying each incident" because they would receive emails of "Significant Incident Reports," which are prepared each time a Border Patrol agent applies use of force. *Id.* "When questioned about her knowledge and reaction to previous deaths of Mexican nationals caused by border patrol agents, Defendant Napolitano stated at a congressional hearing: 'With respect to use of force, an appropriate use of force, we examine each and every case in which there is a death, to evaluate what happened, and whether or not the agent or agents involved should be

subject to some sort of disciplinary measure.'" *Id.* at 21. "Each Supervisor Defendant knew that these killings, individually and collectively, reflected a pattern and practice of Border Patrol agents treating the throwing of rocks at them as per se lethal force to which CBP and DHS policy allowed them to respond with deadly force." *Id.* at 24. "The Supervisor Defendants' failure and refusal to discipline the agents who fired the fatal shots in these incidents, and/or to promulgate a lawful policy regarding appropriate responses to rock-throwers, reinforced Border Patrol agents' belief that the Rocking Policy was appropriate and lawful." *Id.*

> In June 2010 a Border Patrol agent at the border near El Paso, Texas shot across the border and killed 15-year-old Sergio Hernandez. The agent asserted to FBI investigators that he was "surrounded" by rock-throwers and that the victim was throwing a rock when the agent shot him. Fortunately, a passerby caught the incident on a cellphone video, and two other videotapes – one taken by the Border Patrol itself, and another by a nearby landowner – also later surfaced. Those videos conclusively show that the agent was not surrounded; the agent was not under attack from rocks or anything else; the victim had not thrown and was not throwing any rocks; and the agent had many non-lethal alternatives available to him if he somehow felt threatened, including simply backing up further away from the border.

> After the shooting of Sergio Hernandez, the Interior Secretary of Mexico, Fernando Gómez Mont, personally called Defendant Napolitano, protesting the killing of Hernandez as well as the killing of another Mexican man on the California-Mexico border two weeks before the Hernandez killing. Gómez Mont demanded from Defendant Napolitano that the U.S. and Mexico carry out a joint review of protocols on the use of force by US Border Patrol, stating the "unjustified use of force against our population is unacceptable to the Government of Mexico."

*Id.* at 29.

In June 2010, Mexico's Foreign Relations Department specifically stated to Defendant Napolitano that it "'energetically condemn[ed]' the Border Patrol's killing of Sergio Hernandez, noting particularly that "according to international standards, lethal force must be used only when the lives of people are in immediate danger and not as a dissuasive measure.'" *Id.* at 33. Amnesty International concluded that this shooting was a "grossly disproportionate response and flies in the face of international standards...." *Id.* at 34.

"Some Mexican politicians even demanded that the United States detain and

extradite the shooter to Mexico to stand trial." *Id.* at 29. "Mexican President Felipe Calderon said he and his government are 'worried' about what he called 'this surge of violence against Mexicans' along the border." *Id.* "The U.S. Department of Justice conducted an investigation of the incident and concluded that Sergio Hernandez had not thrown any rock at the agent. But the DOJ nevertheless refused to pursue criminal charges against the agent because his conduct conformed to CBP policy." *Id.* at 30.

"Defendants Bersin, Aguilar, Napolitano failed and refused to modify or abandon the Rocking Policy in the face of now several patently unlawful killings." *Id.* at 31.

> Instead, Defendant Bersin personally signed and issued CBP's amended use of force policy in October 2010 with no attempt to address what he and the other Supervisor Defendants knew or reasonably should have known was a pattern and practice of border agents unjustifiably using deadly force in response to alleged rock throwers. Defendant Napolitano, as Secretary of DHS, personally approved CBP's patently unlawful October 2010 use of force policy handbook despite having knowledge of the facts surrounding previous killings, and having been specifically told by Mexican officials, human rights organizations, and others of such unlawful practices by border agents.
>
> Neither Napolitano, Aguilar, Bersin, Fisher nor any Supervisor Defendant ever publicly reprimanded or disciplined any agent for shooting at a Mexican so long as the Agent alleged a rock was thrown. Accordingly, Border Patrol agents knew that the existing use of force policy would allow them to continue to use lethal force in such situations.

*Id.*

The SAC also alleges that several Border Patrol spokespersons and representatives publicly referred to rock-throwing as per se lethal force that justifies the use of lethal force. "For example, after border agents killed Guillermo Martinez Rodriguez in 2005, claiming he was throwing rocks while simultaneously running away, an official spokesperson for the Border Patrol publicly justified the shooting, stating: 'If I was put in the same shoes of this agent, that's exactly what we'd have to do.'" *Id.* at 26. In addition, "the National Border Patrol Council of the American Federation of Government Employees ('NBPC') issued a nationwide press release that succinctly stated the Rocking Policy. The NBPC represents more than 17,000 Border Patrol agents and support staff." *Id.* at 27. "The heading of the NBPC press release

stated bluntly, 'Rock Assaults are Deadly Force.' The statement continued, 'Since biblical times rocks have been used as a crude but effective weapon to injure and kill humans.'" *Id.* "The statement made unmistakably clear that the Rocking Policy treats rock-throwing as per se lethal force to which agents are justified in responding with lethal force: 'Rocks are weapons and constitute deadly force. If an agent is confronted with deadly force they will respond in kind.'" *Id.* "Each Supervisor Defendant had actual knowledge of these repeated public statements by Border Patrol spokespersons and union representatives. Despite this knowledge, none of the Supervisor Defendants countermanded any of the statements either publicly or through the chain of command." *Id.* at 28.

The SAC also alleges several instances of human rights organizations publicly denouncing excessive force at the border prior to Yañez's death. Some of these statements denounced the use of deadly force against rock-throwers. For example, in 2008, the executive director of the American Civil Liberties union wrote to members of Congress stating: "Simply put, it is not acceptable to use lethal force when confronted with rock throwers in ... border protection situations." *Id.* at 32.

In 2012, DHS and CBP commissioned PERF, "a highly respected non-profit organization that advises law enforcement agencies on best practices, to review the then-extant use of lethal force policies for border patrol agents and to review the deadly force incidents from January 2010 through October 2012." *Id.* at 35. The SAC alleges that PERF provided DHS and CBP with a report in 2013 (the "PERF Report"). The SAC alleges that the PERF Report: (1) found that some Border Patrol shootings of rock-throwers could have been avoided; (2) recommended specific training for Border Patrol agents on responding to rock-throwing; and (3) recommended use of force policies specifically addressing rock-throwing encounters.

On November 5, 2013, Defendant Fisher announced that the agencies had decided to reject the report "and instead to reaffirm yet again the unlawful Rocking Policy." *Id.* at 37. On March 7, 2014, at the insistence of new Secretary of Homeland

Security Jeh Johnson, Defendant Fisher amended the policy. "In a memorandum to agents he stated for the first time that agents should, among other things ... 'avoid placing themselves in positions where they have no alternative to using deadly force ... not discharge firearms in response to thrown or hurled projectiles unless the agent has a reasonable belief, based on the totality of the circumstances, to include the size and nature of the projectiles, that the subject of such force poses an imminent danger of death or serious injury[] and ... first 'seek[] cover or distanc[e] themselves from the immediate area of danger.'" *Id.* at 37. In May 2014, CBP "finally revised its Use of Force Policy Handbook" to include similar language. *Id.*

The SAC alleges that the Supervisor Defendants' failure to train, discipline, countermand public statements, and amend use of force policies proximately caused Yañez's death.

The SAC asserts the following claims for relief: (1) violation of the law of nations against the Government Defendants; (2) violation of the Fifth Amendment's Due Process Clause against the Supervisor Defendants; (3) violation of the Fifth Amendment's Due Process Clause against the Agent Defendants; (4) violation of the Fourth Amendment prohibition against unreasonable seizures against the Supervisor Defendants; (5) violation of the Fourth Amendment prohibition against unreasonable seizures against the Agent Defendants; (6) violation of Fifth Amendment equal protection against the Supervisor Defendants; and (7) violation of Fifth Amendment equal protection against the Agent Defendants. The SAC requests compensatory damages, punitive damages, and attorneys' fees.

**III. Request for Judicial Notice (ECF No. 66)**

Defendants request judicial notice of the 2010 Customs and Border Patrol ("CBP") Use of Force Policy Handbook and the February 2013 PERF Report. Defendants contend that the contents of these documents are proper subjects of judicial notice because they are cited to and referenced in the SAC. Plaintiffs do not oppose judicial notice of these documents.

"A court may ... consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). "[A] district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as stated in Abrego Agrego v. The Dow Chem. Co.*, 443 F.3d 676, 681-82 (9th Cir. 2006). "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 454 (9 th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

The Court will consider the 2010 CBP Use of Force Policy Handbook and the February 2013 PERF report because their "contents are alleged" in the SAC, and their "authenticity no party questions" because Plaintiffs do not oppose Defendants' request. *Branch*, 14 F.3d at 454.

**IV. The 2010 CBP Use of Force Policy Handbook and the February 2013 PERF Report**

The 2010 CBP Use of Force Policy Handbook, dated October 2010, provides, in relevant part:

> 2. Authorized Officers/Agents may use deadly force only when necessary, that is, when the officer/agent has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer/agent or to another person.
>
> 3. If feasible, and if to do so would not increase the danger to the officer/agent or others, a verbal warning to submit to the authority of the officer/agent shall be given prior to the use of deadly force.
>
> 4. Discharging a firearm at a person shall be done only with the intent of stopping that person from continuing the threatening behavior that justifies the use of deadly force.
>
> 5. Deadly force is not authorized solely to prevent the escape of a fleeing

subject. Deadly force against a fleeing subject is only authorized, in accordance with the paragraphs above, if there is probable cause to believe that:

> a. The subject has inflicted or threatens to inflict serious physical injury or death; and
>
> b. The escape of the subject poses an imminent threat of death or serious physical injury to the officer/agent or to another person.

(ECF No. 66-1 at 4).

The 2013 PERF Report states that it has reviewed "all CBP use of deadly force events from January 2010 through October 2012 and CBP use of force policies, equipment, tactics, and training." *Id.* at 10. The 2013 PERF Report further states that "[t]he case reviews raise a number of concerns, especially with regard to ... shots fired at subjects throwing rocks and other objects at agents." *Id.*

> [O]fficers/agents should be prohibited from using deadly force against subject throwing objects not capable of causing serious injury or death to them. Officers/agents should be trained to specific situations and scenarios that involve subjects throwing such objects. The training should emphasize pre-deployment strategies, the use of cover and concealment, maintaining safe distances, equipping vehicles and boats with protective cages and/or screening, de-escalation strategies, and where reasonable the use of less-lethal devices.

*Id.*

"Because these changes are significant departures from current practice CBP will need to craft an implement strategy for re-orientation training before new policies go into effect." *Id.* at 11. The 2013 PERF Report recommends:

> Review of shooting cases involving rock throwers revealed that in some cases agents put themselves in harm's way by remaining in close proximity to the rock throwers when moving out of range was a reasonable option. Too many cases do not appear to meet the test of objective reasonableness with regard to the use of deadly force. In cases where clear options to the use of deadly force exist and are not utilized in rock-throwing incidents, corrective actions should be taken. CBP should improve and refine tactics and policy that focus on operational safety, prioritization of essential activities near the border fence, and use of specialized less lethal weapons with regard to rock throwing incidents. The state [sic] CBP policy should be: **"Officers/agents are prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them."**

*Id.* at 14-15 (emphasis in original). The SAC alleges that, in May 2014, CBP "finally revised

its Use of Force Policy Handbook" to include similar language. (ECF No. 61 at 37).

## V. Motion to Dismiss (ECF No. 65)

Defendant Aguilar moves to dismiss the SAC on the grounds that the Court lacks personal jurisdiction over him. Defendants Napolitano, Bersin, Aguilar, and Fisher move for qualified immunity on all claims. However, Defendants Napolitano, Bersin, Aguilar, and Fisher's memorandum of points and authorities only addresses Plaintiffs' fourth claim for violation of the Fourth Amendment, and Defendant Fisher does not address the sufficiency of allegations specific to him. Defendant Nelson moves for qualified immunity on all of Plaintiffs' claims. However, Defendant Nelson only addresses Plaintiffs' fifth claim for violation of the Fourth Amendment.

### A. Personal Jurisdiction over Defendant Aguilar

Defendant Aguilar is sued in his individual capacity for his acts and omissions as Chief of Border Patrol, Deputy Commissioner of CBP, and Acting Commissioner of CBP. Defendant Aguilar contends that the SAC fails to allege that he has ongoing activities in California to support general jurisdiction over him. Defendant Aguilar contends that the SAC does not cure the FAC's deficient jurisdictional allegations. Defendant Aguilar contends that the SAC contains only allegations of his omissions in failing to take corrective action to stop the Rocking Policy and lacks allegations showing intentional acts aimed at California.

Plaintiffs contend that the SAC sufficiently alleges Defendant Aguilar's personal involvement in the constitutional violation, and, therefore, Plaintiffs have met their burden of pleading personal jurisdiction "as a matter of law." (ECF No. 71 at 24). Plaintiffs contend that they have stated a claim against Defendant Aguilar because they have alleged facts demonstrating Defendant Aguilar's awareness of the Rocking Policy.

#### i. 12(b)(2) Standard

On a motion to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction. *Farmers Ins. Exch. v. Portage*

*La Prarie Mut. Ins. Co.,* 907 F.2d 911, 912 (9th Cir. 1990). Where the motion to dismiss is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to satisfy this burden. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1108 (9th Cir. 2002). While the plaintiff cannot "simply rest on the bare allegations of its complaint," *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977), uncontroverted allegations in the complaint must be taken as true. *AT&T v. Campagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996). Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.*; *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal."). "[I]f a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Data Disc, Inc. v. Sys. Tech. Associates, Inc.,* 557 F.2d 1280, 1285 (9th Cir. 1977).

The exercise of personal jurisdiction over a nonresident defendant must be authorized under the state's long-arm statute and must satisfy the due process clause of the United States Constitution. *Pac. Atl. Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1327 (9th Cir. 1985). California's long-arm statute permits the exercise of personal jurisdiction "on any basis not inconsistent with the Constitution of this state or the United States." Cal. Code Civ. Proc. § 410.10. Under due process analysis, a defendant may be subject to either general or specific personal jurisdiction. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

### ii. General Jurisdiction

To exercise general jurisdiction over a non-resident defendant, the defendant must have "continuous and systematic" contacts that "approximate physical presence in the forum state." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th

Cir. 2004) (citations and internal quotations omitted).

The SAC alleges no facts showing that Defendant Aguilar has "continuous and systematic" contacts in California. The Court concludes Plaintiffs have failed to make a prima facie showing that this Court has general personal jurisdiction over Defendant Aguilar.

### iii. Specific Jurisdiction

The Ninth Circuit analyzes specific jurisdiction according to a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Menken v. Emm,* 503 F.3d 1050, 1057 (9th Cir. 2007). With respect to the first prong, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980). "Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297. "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) (plurality opinion). An intent to serve the entire U.S. does not necessarily show purposeful availment of the privilege of conducting business in any particular state. *See id.* at 2790.

"[T]he purposeful direction or availment requirement for specific jurisdiction is analyzed in intentional tort cases under the 'effects' test derived from *Calder v. Jones*, 465 U.S. 783 ... (1984)." *Dole*, 303 F.3d at 1111. "[T]he 'effects' test requires that the

defendant allegedly [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* Whether an act is "expressly aimed" at the forum state requires "something more" than "foreseeable effects in the forum state." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006). It is not sufficient that the non-resident defendant "directed his conduct at plaintiffs whom he knew had [forum state] connections." *Walden v. Fiore*, 134 S. Ct. 1115, 1124 (2014).

Plaintiffs cite to *Arar v. Ashcroft*, 585 F.3d 559, 563 (2d Cir. 2009) for the proposition that a Plaintiff establishes personal jurisdiction over a governmental supervisory defendant by sufficiently alleging his or her personal involvement in the alleged constitutional violation. In *Arar*, the Second Circuit applied its test for personal jurisdiction over supervisory officials in the constitutional context:

> [T]he allegations must suggest that the supervisory official ...
>
> (1) directly participated in the violation [of his constitutional rights], (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

532 F.3d at 173. The Second Circuit held that the plaintiff had sufficiently alleged personal jurisdiction over the supervisor defendants by alleging that the supervisor defendants had a policy of removing non-U.S. citizens suspected of terrorist activity to countries where they could be interrogated under torture, and that they directed or acquiesced in the plaintiff's removal to Syria. *Id.* at 174-75.

Courts in this circuit apply the Ninth Circuit's purposeful direction test to constitutional claims against government supervisors. *See, e.g.*, *Am. Humanist Ass'n v. United States*, —F. Supp. 3d—, No. 14cv00565, 2014 WL 5500495, at *10-11 (D. Or. Oct. 30, 2014) (concluding that the complaint sufficiently alleged personal jurisdiction over the Regional Director of the United States Bureau of Prisons because he affirmed in writing the administrative denial of the plaintiffs' request to meet as a group, which was "an intentional act directed at the forum state").

As stated in the Court's September 3, 2014 Order, Defendant Aguilar's "alleged omissions—failures to train, supervise, and prevent or correct the use of the Rocking Policy—are not 'intentional act[s] ... expressly aimed at the forum state.'" (ECF No. 46 at 14) (citing *Yahoo!*, 433 F.3d at 1206).  None of the allegations as to Defendant Aguilar in the SAC amount to "intentional acts"; the SAC seeks to hold Defendant Aguilar liable for his various omissions. *See* ECF No. 61 at 7 ("Defendant Aguilar, at a minimum, knew of and acquiesced in the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Yañez."); *id.* at 26 ("Not a single one of those agents was ever disciplined by the Supervisor Defendants; nor was there ever an attempt by Defendants Napolitano, Bersin, Fisher, Aguilar, or any other Supervisor Defendants to respond to the concerns of the Government of Mexico by bringing the unlawful Rocking Policy into compliance with the law."); *id.* at 31 ("Defendants Bersin, Aguilar, Napolitano failed and refused to abandon the Rocking Policy in the face of now several patently unlawful killings."); *id.* ("Neither Napolitano, Aguilar, Bersin, Fisher nor any Supervisor Defendant ever publicly reprimanded or disciplined any agent for shooting at a Mexican so long as the Agent alleged a rock was thrown.").  Even assuming Defendant Aguilar's alleged omissions can constitute "intentional acts," none of these omissions directly connect him to California.  The possibility that Defendant Aguilar's omissions may have foreseeably caused excessive force in California is insufficient to show that his omissions were "expressly aimed" at California. *Pebble Beach*, 453 F.3d at 1156 (noting that whether an act is "expressly aimed" at the forum state requires "something more" than "foreseeable effects in the forum state").

Defendant Aguilar's motion to dismiss for lack of personal jurisdiction is granted. Because the Court finds that further amendment would be futile, the SAC is dismissed with prejudice as to Defendant Aguilar.

**B.  Qualified Immunity of Defendants Napolitano, Bersin, and Fisher**

Defendant Napolitano is sued in her individual capacity for her allegedly

unlawful acts and omissions as Secretary of DHS. Defendant Bersin is sued in his individual capacity for his allegedly unlawful acts and omissions as Commissioner of CBP. Defendant Fisher is sued in his individual capacity for his allegedly unlawful acts and omissions as Chief of Border Patrol.

Defendants Napolitano, Bersin, and Fisher contend that at the time of the alleged constitutional violation, the "knowledge and acquiescence" standard was not clearly established in the Fourth Amendment context. Defendants contend that, even if it was clearly established, the SAC fails to allege sufficient facts demonstrating Defendants Napolitano and Bersin's knowledge and acquiescence of the Rocking Policy.[4]

Plaintiffs contend that the knowledge and acquiescence standard applied to supervisors for excessive force claims long before Yañez was killed. Plaintiffs contend that the SAC "includes several new individualized allegations" as to Defendants Napolitano and Bersin. (ECF No. 71).

### i. 12(b)(6) Standard in the Qualified Immunity Context

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

---

[4] Defendant Fisher "moves to dismiss the SAC, but only as to the clearly-established prong of qualified immunity...." (ECF No. 65-1 at 9).

(quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

Where government officials are sued in their individual capacities for civil damages, a court must "begin by taking note of the elements a plaintiff must plead to state a claim ... against officials entitled to assert the defense of qualified immunity." *Iqbal*, 556 U.S. at 675. Government officials are entitled to qualified immunity unless the plaintiff can allege the violation of a "clearly established" constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). One "inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). The other inquiry a court must undertake is whether the defendant's actions "violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

### ii. Supervisory Liability in the Fourth Amendment Context

"In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). "The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* at 676.

### a. In General

"Because *Iqbal* requires courts to apply an equivalent standard to supervisors and subordinates ... a supervisor faces liability under the Fourth Amendment only where 'it would be clear to a reasonable [supervisor] that his conduct was unlawful in the situation he confronted.'" *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)) (alterations in original). To meet this standard, a plaintiff must allege, at a minimum, a "factual basis for imputing ... knowledge" of an unconstitutional practice undertaken by subordinates, coupled with culpable action or inaction. *Id.* at 1111.

In *Chavez*, the plaintiffs operated a daily shuttle service between Sasabe, Arizona, and Tucson, Arizona. The plaintiffs alleged that they were stopped by Border Patrol on "almost a daily basis" without reasonable suspicion and due to the "Latin, Hispanic or Mexican appearance of drivers and/or other occupants of vehicles." *Id.* at 1106. The plaintiffs asserted a Fourth Amendment claim against five supervisory personnel of the Border Patrol to whom they complained to of these frequent stops "at various times." *Id.* at 1111. The plaintiffs also asserted a Fourth Amendment claim against the Acting Commissioner of the Immigration and Naturalization Service ("INS"), who "reviews and must approve ... operation plans and enforcement programs developed by the Chief Border Patrol Agents immediately in command of Sector forces[,]" and the Chief Border Patrol Agent for the Tucson Sector, who "had line authority over and direct responsibility for the ongoing activities and operations of Border Patrol agents assigned to field duty in the Tucson sector." *Id.* at 1110-11.

With respect to four of the five supervisory personnel to whom the plaintiffs complained, the Court of Appeals for the Ninth Circuit held that the "complaint fails to plausibly allege that a reasonable supervisor would have found it clear that [four of the five supervisors] acted unlawfully in the situations they confronted." *Id.* at 1111. The court concluded that a "reasonable supervisor would not find it clear that, by failing to investigate vague complaints of 'frequent stops,' which plaintiffs made at 'various,'

unspecified times," these supervisors acted unlawfully. *Id.* The court found that the complaint failed to allege any details of the plaintiffs' complaints that, if brought to the supervisors' attention, would plausibly put them on notice that the plaintiffs were being routinely stopped in an unconstitutional manner.

The court held the same with respect to the Acting Commissioner of INS. The court reasoned that there were no allegations demonstrating that the Acting Commissioner's review of enforcement programs "would have alerted him to the allegedly unconstitutional searches...." *Id.* at 1110. Finally, the court held the same with respect to the Chief Border Patrol Agent for the Tucson Sector because "plaintiffs fail to explain why ... [he] would have reason to know that Border Patrol Agents, who presumably conduct numerous stops, had frequently stopped plaintiffs, much less than that they did so without reasonable suspicion" and "have no factual basis for imputing any such knowledge to [him] and the other supervisors...." *Id.* at 1111.

*Chavez* demonstrates that supervisory liability in the Fourth Amendment context requires, at a minimum, knowledge of a pattern or practice of unconstitutional actions taken by subordinates, coupled with culpable action or inaction.[5]

### b. Failure to Train

"[C]ulpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). "[F]ailure to train ... employees in a relevant respect must amount to 'deliberate

---

[5] In addition to *Chavez*, recent Ninth Circuit cases in other constitutional contexts are instructive in their analysis of whether allegations against supervisory defendants are sufficient to infer supervisory knowledge of a pattern or practice of unconstitutional activity. *Cf. Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) (finding the allegations of the complaint sufficient to infer the supervisors knowledge from "numerous incidents in which inmates in Los Angeles County jails have been killed or injured because of the culpable actions of the subordinates" and "several reports, of systematic problems in the county jails under his supervision[,]" in a case alleging unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments); *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1073 (2012) (holding that "knowledge suffices for free speech violations under the First and Fourteenth Amendments" and holding that the complaint stated a claim for knowledge and acquiescence in an unconstitutional unwritten school newspaper policy because "they knew that [their subordinate] denied [the] plaintiffs' publication the same access to the campus that [another student publication] received; and they did nothing").

indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1988)). "Deliberate indifference is a stringent standard of fault, requiring proof that a [government] actor disregarded a known or obvious consequence of his action." *Id.* at 1360 (internal quotations and citation omitted). "[W]hen [governmental supervisors] are on actual or constructive notice that a particular omission in their training program causes [subordinates] to violate citizens' constitutional rights, [supervisors] may be deemed deliberately indifferent if the [supervisors] choose to retain the program." *Id.* "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* (internal quotations and citation omitted). Although *Connick* analyzed a claim against a governmental official in his official capacity, *Connick* is equally applicable to claims against government supervisors in their individual capacity. *See Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1158-59 (9th Cir. 2014) ("As to an official in his individual capacity, the same standard applies—[a plaintiff] must show that [a supervisor defendant] was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights.").

### iii. Whether the SAC Sufficiently Alleges Fourth Amendment Supervisory Liability Claims Against Defendants Napolitano and Bersin

The Court must determine whether Plaintiffs' allegations against Defendants Napolitano and Bersin "if true, establish a constitutional violation" for violation of the Fourth Amendment in their role as supervisors. *Hope*, 536 U.S. at 736.

The SAC asserts that Defendants Napolitano and Bersin violated Yañez's Fourth Amendment rights by "personally developing, authorizing, and conspiring to effect, and permitting and directing their subordinates to implement, the Rocking Policy ... failing to establish adequate procedures to train the Border Patrol agents, failing to establish adequate disciplinary procedures and adequate procedures to investigate agents'

misconduct, and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force." (ECF No. 61 at 56).

With respect to Defendant Napolitano, the SAC alleges that Defendant Napolitano, as Secretary of DHS from January 21, 2009 through September 6, 2013, "was responsible by law for ... ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States." (ECF No. 61 at 6). The SAC alleges that Defendant Napolitano "at a minimum, knew of and acquiesced in the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Yañez." *Id.* The SAC alleges that the CBP files a Significant Incident Report each time a Border Patrol agent uses force. "Once completed, every such Report was emailed to every supervisor at every level of the agency on a daily basis." *Id.* at 21. "When questioned about her knowledge and reaction to previous deaths of Mexican nationals caused by border patrol agents, Defendant Napolitano stated at a congressional hearing: 'With respect to use of force, an appropriate use of force, we examine each and every case in which there is a death, to evaluate what happened, and whether or not the agent or agents involved should be subject to some sort of disciplinary measure.'" *Id.*

The SAC details several deaths of Mexican nationals at the border that resulted from alleged rock-throwing prior to June 2011, statements from human rights organizations condemning excessive force in this context, and statements from Border Patrol spokespersons and representatives.

> After the shooting of Sergio Hernandez, the Interior Secretary of Mexico, Fernando Gómez Mont, personally called Defendant Napolitano, protesting the killing of Hernandez as well as the killing of another Mexican man on the California-Mexico border two weeks before the Hernandez killing. Gómez Mont demanded from Defendant Napolitano that the U.S. and Mexico carry out a joint review of protocols on the use of force by US Border Patrol, stating the "unjustified use of force against our population is unacceptable to the Government of Mexico."

*Id.* at 29. The SAC alleges that "Defendant Napolitano, as Secretary of DHS, personally approved CBP's patently unlawful October 2010 use of force policy handbook despite having knowledge of the facts surrounding previous killings, and

having been specifically told by Mexican officials, human rights organizations, and others of such unlawful practices by border agents." *Id.* at 31. "In June 2010, Mexico's Foreign Relations Department said specifically to Defendant Napolitano that it 'energetically condemn[ed]' the Border Patrol's killing of Sergio Hernandez, noting particularly that 'according to international standards, lethal force must be used only when the lives of people are in immediate danger and not as a dissuasive measure.'" *Id.* at 33.

With respect to Defendant Bersin, the SAC alleges that Defendant Bersin "served as the Commissioner of the CBP from March 2010 through December 2011...." (ECF No. 61 at 7). The SAC alleges that "[i]n response to the public uproar [following the death of Sergio Hernandez], Defendant Bersin traveled to El Paso after the shooting and stated to the media that an investigation into Hernandez's shooting would be 'transparent and fair.' 'We cannot and should not jump to conclusions,' Bersin said." *Id.* at 30. The SAC alleges:

> In September 2010, human rights organizations across the country met with CBP and DHS officials in Washington, D.C. to discuss CBP's training guidelines and criteria for use of force. When specifically confronted about the case of Sergio Hernandez, Defendant Bersin stated how Hernandez's death 'was not an accident.' Defendant Bersin claimed Hernandez's shooting was justified because someone else allegedly threw a rock at the agent. Bersin did not acknowledge that the agent could have backed away from the alleged rock-thrower or used less-than-lethal force.

*Id.* at 31. The SAC alleges that "Defendant Bersin personally signed and issued CBP's amended use of force policy in October 2010 with no attempt to address what he and the other Supervisor Defendants knew or reasonably should have known was a pattern and practice of border agents unjustifiably using deadly force in response to alleged rock throwers." *Id.* The SAC alleges that in May 2014, after Defendant Bersin had stepped down, CBP "finally revised its Use of Force Policy Handbook" to include language addressing use of force in response to "thrown or launched projectiles." *Id.* at 37-38.

**a. Failure to Train**

13cv1417-WQH-NLS

The SAC alleges no facts to support the inference that either Defendant Janet Napolitano, as Secretary of DHS, or Defendant Bersin, as Commissioner of CBP, were directly responsible for the training of Border Patrol agents in their use of force. Instead, the facts alleged in the SAC suggest that the Chief of Border Patrol, not the Secretary of DHS or Commissioner of CBP, is directly responsible for implementing Border Patrol training programs. *See* ECF No. 61 at 35-37 (alleging that Defendant Fisher initially rejected, but later accepted, the recommendations of the PERF report, which included recommendations with respect to training and guidance in situations where Border Patrol agents are confronted with rock-throwers).

In addition, the SAC fails to allege sufficient facts to permit the "reasonable inference" that Defendants Napolitano and Bersin "disregarded a known or obvious consequence" of their failure to properly train Border Patrol agents on use of force in response to rock-throwing. *Moss*, 572 F.3d at 969; *Connick*, 131 S. Ct. at 1360. The fact that there were ten rock-throwing deaths along the United States-Mexico Border over an eight year period does not plausibly demonstrate an "obvious" need for rock-throwing-specific use of force training, such that the failure to provide that training amounts to "deliberate indifference." *Id.* at 1359-60. The Associated Press article incorporated by reference in the SAC reveals that Border Patrol Agents were attacked with rocks 339 times in 2011 and 185 times in 2012. *Associated Press Exclusive: Border Patrol Rejects Curbs on Force* (April 23, 2015), available at http://bigstory.ap.org/article/ap-exclusive-border-patrol-rejects-curbs-force.

### b. Other Alleged Culpable Action and Inaction

Defendants contend that the SAC does not plausibly allege the existence of the Rocking Policy because an article cited in the SAC states that, between 2011 and 2012, agents were attacked with rocks 524 times but responded with gunfire only 10% of the time. Defendants contend that the 2013 PERF Report also makes the existence of the Rocking Policy implausible because two or more shootings in response to rock throwing were determined by CBP to be violations of its use of force policy.

Defendants contend that the 2013 PERF Report's recommendation for use of force against rock throwers was already covered by CBP's existing use of force policy. Defendants contend that CBP's use of force policy was constitutional at the time of Yañez's death.

Defendant Napolitano contends that Plaintiffs have failed to allege sufficient facts showing Defendant Napolitano's personal involvement in the alleged excessive force. Defendant Napolitano contends that alleged communications putting her on notice after the alleged shooting "cannot constitute personal involvement." (ECF No. 65-1 at 26). Defendant Napolitano contends that her statement at a Congressional hearing that "we examine each and every case in which there is a death, to evaluate what happened, and whether or not the agent or agents involved should be subject to some sort of disciplinary measure" does not plausibly show that "she herself examined every shooting personally." *Id.* Defendant Napolitano contends that her alleged signing off on the CBP Use of Force Policy Handbook does not permit the Court to infer her knowledge. Defendant Napolitano contends that just because she is alleged to have received an email each time deadly force was used by the CBP, it does not plausibly suggest that she read each email or that those emails related to her daily duties.

Defendant Bersin contends that it is not plausible to assume that he individually read each Significant Incident Report sufficiently enough to "become intimately aware of the underlying facts." (ECF No. 65-1 at 27). Defendant Bersin contends that Plaintiffs' allegations of his knowledge of the Rocking Policy are implausible because he was responsible for 60,000 CBP employees, and there were more than 1.5 million apprehensions at the southern border between 2010 and 2013. Defendant Bersin contends that his knowledge of the death of Sergio Hernandez does not make it plausible that he was aware of the Rocking Policy.

Plaintiffs contend that the SAC adds new factual allegations to detail Defendant Napolitano's personal involvement, including: (1) receiving several letters from the government of Mexico and human rights organizations regarding the use of force in

13cv1417-WQH-NLS

response to rock throwing, (2) personally reviewing "each case where an agent killed another pursuant to the Rocking Policy," and (3) personally approving the 2010 CBP Use of Force Policy Handbook with no attempt to address the use of deadly force against rock-throwers. (ECF No. 71 at 21-22). Plaintiffs contend that allegations of notice given to Defendant Napolitano after Yañez's death permit the inference that Defendant Napolitano was aware of the relevant facts before Yañez's death because it was not the first time she was alerted to them. Plaintiffs contend that they are entitled to the inference that Defendant Napolitano personally read the reports of deaths at the border when she used the word "we." *Id.* at 23-24.

Plaintiffs contend that the SAC adds new factual allegations to detail Defendant Bersin's personal involvement, including: (1) receiving Significant Incident Reports created after each shooting, (2) personally participating in the investigation of the death of Sergio Hernandez and concluding that the shooting was justified, despite facts demonstrating that the agent could have avoided using lethal force; (3) personally meeting with human rights organizations regarding the Border Patrol's use of force policy; and (4) personally signing the 2010 CBP Use of Force Policy Handbook with no attempt to address the use of deadly force against rock-throwers.

Plaintiffs contend that the Court already found that the FAC plausibly alleged the existence of the Rocking Policy. Plaintiff contends that they allege sufficient facts to plausibly support the existence of the Rocking Policy based on: (1) the recommendations and findings of the 2013 PERF Report; and (2) the Obama Administration finally amending the CBP Use of Force Policy Handbook.

The SAC alleges that Defendant Napolitano was Secretary of the Department of Homeland Security for the relevant period and that Defendant Bersin was the Commissioner for Customs and Border Protection for the relevant period. At this level of the supervisory chain of command, the Court cannot draw the "reasonable inference" that Defendants Napolitano and Bersin were aware of a pattern or practice of excessive force in response to rock throwing, absent factual allegations demonstrating specific

notice of a such a pattern or practice. *Moss*, 572 F.3d at 969; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"); *Blantz v. Cal. Dep't of Corrections and Rehabilitation, Div. of Correctional Health Care Srvcs.*, 727 F.3d 917, 927 (9th Cir. 2013) ("It is plausible that the CDCR employees who made the decisions and took the actions Blantz complains of did so at the direction of their *immediate* superiors.  But common sense requires us to reject the allegation that the Chief Medical Officer for the state-wide prison system, who sits on the Governing Body, was personally involved in the decision to terminate [the plaintiff]....") (emphasis in original); *al-Kidd v. Ashcroft*, 580 F.3d 949, 964-65 (9th Cir. 2009), *rev'd on other grounds*, 131 S.Ct. 2074 (2011) (finding that it was "possible" that media reports put then-Attorney General John Ashcroft on notice of a "systemic problem at DOJ with respect to its treatment of material witnesses, [but] the non-specific allegations in the complaint regarding Ashcroft's involvement fail to nudge the *possible* to the *plausible*, as required by *Twombly*.").

The allegation that Defendants Napolitano and Bersin received a mass email each time a Border Patrol agent used force does not permit the "reasonable inference" that these Defendants were able to appreciate a pattern of excessive force specific to alleged rock-throwing incidents that would require them to take corrective action. *Moss*, 572 F.3d at 969.  Similarly, Defendant Napolitano's statement at a Congressional hearing—that "we" review each instance of deadly force to determine whether discipline is warranted—does not permit the "reasonable inference" that she personally investigated each instance of deadly force such that she would recognize that there was a pattern or practice of excessive force in response to rock-throwing. (ECF No. 61 at 21).

Finally, as discussed in this Court's September 3, 2014 Order, the fact that Defendant Napolitano was personally notified of one instance of excessive force in response to rock throwing "is not sufficient to plausibly put her on notice of the alleged

Rocking Policy." (ECF No. 46 at 19) (citing *al-Kidd*, 580 F.3d at 979). The SAC again alleges facts demonstrating that Defendants Napolitano and Bersin were specifically put on notice of the death of Sergio Hernandez, but fails to allege facts that they were given similar notice of other rock-throwing deaths, let alone a pattern or practice of excessive force used in response to rock-throwing, prior to Yañez's death.

The Court concludes that the SAC "fail[s] to nudge the *possible* to the *plausible*" in demonstrating Defendant Napolitano and Bersin's knowledge of a pattern or practice of excessive force in response to rock throwing, and are therefore liable for culpable action or inaction that caused Yañez's death. *al-Kidd*, 580 F.3d at 979.

### c. Conclusion

The Court concludes that Defendants Napolitano and Bersin are entitled to qualified immunity on the ground that the allegations of the SAC fail to make out a constitutional violation. *Hope*, 536 U.S. at 736. Because the Court finds that further amendment would be futile, Plaintiffs' fourth claim is dismissed with prejudice as to Defendants Napolitano and Bersin.[6]

### iv.    Whether the Fourth Amendment Supervisory Liability Standard  was Clearly Established at the Time of Yañez's Death

In the Court's September 3, 2014 Order, the Court concluded that the FAC stated a plausible Fourth Amendment supervisory liability claim against Defendant Fisher.

Defendant Fisher now contends that he is entitled to qualified immunity on the grounds that the Fourth Amendment supervisory liability standard was not clearly established at the time of Yañez's death. Defendant Fisher contends that, at the time of the alleged shooting—June 21, 2011—it was not clearly established that "knowledge and acquiescence" governed supervisory liability for Fourth Amendment excessive force claims. (ECF No. 65-1 at 17-18). Defendant Fisher contends that at this time, the

---

[6]    The Court only dismisses Plaintiffs' fourth claim, at this stage in the proceedings, because it is the only claim addressed in Defendants' briefing.

governing standard was *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which held that "knowledge and acquiescence" is "insufficient to satisfy" the standard for supervisory liability in the *Bivens* context. *Id.* at 18. Defendant Fisher contends that months later, in *al-Kidd*, 580 F.3d 949, the dissent questioned whether the "knowing failure to act" standard survived *Iqbal*. *Id.* at 19. Defendant Fisher contends that the Court relied on *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) in its September 3, 2014 Order, even though that case was decided four weeks after the alleged shooting incident. Defendant Fisher contend that *Starr v. Baca*'s holding is limited to Eighth Amendment deliberate indifference claims. Defendants contend that as late as 2013 it has been debated whether the "knowledge and acquiescence" standard survived *Iqbal.*

Plaintiffs contend that, as early as 1991, "it was clearly established in this Circuit that supervisors are liable when they know of and acquiesce in their subordinates' use of excessive force." (ECF No. 71 at 8) (citing *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093-94 (9th Cir. 1998); and *Redman v. County of San Diego*, 942 F.2d 1435, 1147-48 (9th Cir. 1991)). Plaintiffs contend that *Iqbal* did not "'unsettle' the knowledge and acquiescence standard governing excessive use of force claims" because *Iqbal* "held only that knowledge and acquiescence was insufficient to establish a claim of *purposeful discrimination*, and the Court expressly tied the level of intent necessary for supervisor liability to *the underlying constitutional tort*." *Id.* at 9 (emphasis in original). Plaintiffs contend that *Starr v. Baca* was decided before the alleged shooting, and clarified that "*Iqbal* does not affect the standard governing supervisor liability claims when, as is the case here, the level of intent necessary for supervisor liability is greater than needed for the underlying constitutional tort...." *Id.* at 10.

"To determine whether a public official is protected by qualified immunity," a court should consider "whether the official's conduct violated a constitutional right, and ... whether that right was clearly established at the time of the event in question." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009). A district court has discretion "in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. As to the clearly established prong, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation and internal quotations omitted). "This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Saucier*, 533 U.S. at 201.

"To determine whether a right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 967 (9th Cir. 2010); *see also Bryan v. MacPherson*, 630 F.3d 805, 833 (9th Cir. 2010) (finding that an officer in the defendant's position could have made a "reasonable mistake in law" when there was no Supreme Court or Ninth Circuit decision addressing whether the use of a taser constituted "an intermediate level of force"). A Court may look to "a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Disagreement among judges may be relevant in determining whether a particular right was clearly established at the time of the events in question. *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378 (2009) ("We would not suggest that entitlement to qualified immunity is the guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear if we have been clear. That said, however, the cases viewing school strip searches differently from the way we see them are numerous enough, with well-reasoned majority and dissenting opinions, to counsel

doubt that we were sufficiently clear in the prior statement of law."). However, a court does "not need to find closely analogous case law to show that a right is clearly established." *Bryan*, 630 F.3d at 833; *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

"Although a defendant's subjective intent is usually not relevant to the qualified immunity defense, his mental state *is* relevant when ... it is an element of the alleged constitutional violation." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (holding that it was "clearly established" that prison officials "could not *intentionally* deny or delay access to medical care") (second emphasis added).

> In conducting qualified immunity analysis ... courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct.

*al-Kidd*, 580 F.3d at 964-65 (quoting *Hope*, 536 U.S. at 751 n.9 (2002) (Thomas, J., dissenting)).

*Chavez* is the current standard for supervisory liability in the Fourth Amendment context. "Because *Iqbal* requires courts to apply an equivalent standard to supervisors and subordinates ... a supervisor faces liability under the Fourth Amendment only where 'it would be clear to a reasonable [supervisor] that his conduct was unlawful in the situation he confronted.'" *Chavez*, 683 F.3d at 1110 (quoting *Saucier*, 533 U.S. at 202) (alterations in original). To meet this standard, a plaintiff must allege, at a minimum, a "factual basis for imputing ... knowledge" of an unconstitutional practice undertaken by subordinates, coupled with culpable action or inaction. *Id.* at 1111.

Prior to May, 18, 2009, the date *Ashcroft v. Iqbal* was decided, the governing standard for supervisory liability for Fourth Amendment excessive force was stated as follows:

It has long been clearly established that "[s]upervisory liability is imposed

against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." We have also held that a person "subjects" another to the deprivation of a constitutional right, within the meaning of § 1983, "if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." The requisite causal connection may be established when an official sets in motion a "series of acts by others which the actor knows or reasonably should know would cause others to inflict" constitutional harms.

*Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175, 1183 (9th Cir. 2007) (citing *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005) and *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). Supervisors could be liable for their subordinates use of excessive force if they were on notice of a pattern or practice of excessive force, failed to take corrective action, and that failure foreseeably caused the plaintiff's injury. *See, e.g.*, *Blackenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) (reversing grant of summary judgment for a police chief on a Fourth Amendment excessive force claim on qualified immunity grounds because he approved the personnel evaluations of the police officer who used excessive force "despite repeated and serious complaints against him for use of excessive force[,]" expert testimony suggested "the ineffectiveness of [the police officer's] discipline for those complaints," and "a rational factfinder" could conclude that the police chief "condoned and ratified actions" by the police officer that the police chief "reasonably should have known would cause constitutional injuries like the ones [the plaintiffs] may have suffered").

The Court finds that the pre-May 18, 2009 and current standards for supervisory liability in the Fourth Amendment context both require knowledge of an unconstitutional pattern or practice of excessive force used by subordinates, coupled with culpable action or inaction. However, Defendant Fisher contends that, at the time of the alleged shooting, June 21, 2011, the governing standard was *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which held that "knowledge and acquiescence" is "insufficient to satisfy" the standard for supervisory liability in the *Bivens* context. (ECF No. 65-1 at 17-18). Alternatively, Defendant Fisher contends that, on June 21, 2011, there was

- 34 -

enough disagreement in the Courts following *Iqbal* such that any Fourth Amendment supervisory liability standard established prior to *Iqbal* was no longer clearly established law.

In *Iqbal*, the plaintiff, a citizen of Pakistan and a Muslim, alleged that he was arrested on charges of fraud in relation to identification documents. The plaintiff alleged that he was designated a "person of high interest" in the wake of the September 11 terrorist attacks on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. 556 U.S. at 669. The plaintiff alleged that Attorney General John Ashcroft and Federal Bureau of Investigation Director Robert Mueller "cleared" and "approved" the policy of holding post-September 11 detainees "in highly restrictive conditions" and "knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff to "harsh conditions of confinement" on account of his religion, race, or national origin. *Id.*

The Supreme Court noted that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. The Court further noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* In the discrimination context, the Supreme Court noted that a "plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* The Court therefore held that, in order to state a claim against defendants Ashcroft and Mueller, "[the plaintiff] must plead sufficient factual matter to show that [the defendants] adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 677. The Court rejected the plaintiff's contention that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* "In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is

required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id.*

*Iqbal*'s specific holding was limited to supervisory liability in the discrimination context. However, *Iqbal* requires that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue" and that the same mental state requirements for holding a subordinate liable for a *Bivens* violation be applied to "an official charged with violations arising from his or her superintendent responsibilities[,]" making clear that a uniform supervisory liability standard may require modification with respect to certain constitutional violations. *Id.* at 676-77. From May, 18, 2009 onward, "constitutional tort claims against supervisory defendants turn on the requirements of the particular claim—and, more specifically, on the state of mind required by the particular claim—not on a generally applicable concept of supervisory liability." *OSU Student Alliance*, 699 F.3d at 1071.

Soon after *Iqbal* was decided, a three-judge panel for the Court of Appeals for the Ninth Circuit issued a two-to-one opinion in *al-Kidd*, 580 F.3d 949, which involved a Fourth Amendment unlawful arrest claim against then-Attorney General John Ashcroft. The dissent stated that "[i]t is doubtful that the majority's 'knowing failure to act' standard survived *Iqbal*." *al-Kidd*, 580 F.3d at 992 n.13 (Bea, J., concurring in part and dissenting in part). The majority held that "[t]he complaint clearly alleges facts which might support liability on the basis of Ashcroft's *knowing failure to act* in the light of even unauthorized abuses, but also alleges facts which may support liability on the basis that Ashcroft purposely used the material witness statute to preventatively detain suspects and that al-Kidd was subjected to this policy." *Id.* at 976 (emphasis in original). Because the complaint was sufficient under either standard, the majority declined to resolve whether "the two standards are distinct, or whether the Court's comments relate solely to discrimination claims which have an intent element, because al-Kidd plausibly pleads 'purpose' rather than just 'knowledge' to impose liability on

Ashcroft." *Id.* at 976 n.26.

Four months prior to Yañez's death, on February 11, 2011, another three-judge panel for the Ninth Circuit issued an opinion in *Starr v. Baca*, 633 F.3d 1191, 1196 (9th Cir. 2011), *opinion withdrawn and superseded*, 652 F.3d 1202 (9th Cir. 2011), a case involving an Eighth Amendment conditions of confinement claim asserted against the Los Angeles County Sheriff. The court distinguished *Iqbal* on the ground that the plaintiff in *Iqbal* alleged discrimination, while the plaintiff before the court alleged unconstitutional conditions of confinement. The court concluded that "[w]e see nothing in *Iqbal* that indicates that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases. We also note that, to the extent that our sister circuits have confronted this question, they have agreed with our interpretation of *Iqbal*." *Id.* at 1196. The court then applied the deliberate indifference standard applicable to subordinates to the supervisor defendants named in the complaint.

*Starr* demonstrates that *Iqbal* does not necessarily impose a "purpose" requirement in all constitutional contexts, but instead required that the same requirements for holding a subordinate liable for a *Bivens* violation are equally applicable to "an official charged with violations arising from his or her superintendent responsibilities." *Iqbal*, 556 U.S. at 677.

At the time of Yañez's death, there were no Supreme Court on Ninth Circuit cases available that applied *Iqbal* to a Fourth Amendment excessive force claim asserted against supervisors. However, Fourth Amendment excessive force law was clearly established, and *Iqbal* requires that the Fourth Amendment's mental state requirements be applied equally to supervisors. "[S]pecific intent [is not] required in order to establish a violation of the Fourth Amendment." *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to

their underlying intent or motivation....  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional" *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).  The facts known to the governmental actor are relevant in determining the objective reasonableness of the actor's actions. *See Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (1995) (holding that the district court did not err in allowing police officers to introduce evidence of their knowledge of the plaintiff's criminal history because the testimony was relevant to determining whether the police officers' use of force was objectively reasonable).

Following *Iqbal*, the pre-May 11, 2009 standard remained good law in the Fourth Amendment excessive force context because it was consistent with the Fourth Amendment's mental state requirements: a supervisor's knowledge of a pattern or practice of excessive force by subordinates and failure to take corrective action is not "'objectively reasonable' in light of the facts and circumstances confronting [the supervisor]." *Graham*, 490 U.S. at 396.  As stated previously, the pre-May 11, 2009 standard and *Chavez* both require knowledge of a pattern or practice of excessive force committed by subordinates, coupled with culpable action or inaction.

The Court concludes that the standard remained substantially unchanged both before and after *Iqbal* and before and after *Chavez*.  The Court further concludes that nothing in *Iqbal* raises the standard for supervisory liability for Fourth Amendment excessive force from knowledge of an unconstitutional pattern or practice, coupled with culpable action or inaction, to a standard requiring a higher mental state.

The Court concludes that Defendant Fisher is not entitled to qualified immunity on the ground that the applicable mental state for supervisory liability in the Fourth Amendment context was not clearly established at the time of Yañez's death.[7]

**C. Qualified Immunity of Defendant Nelson (Fifth Claim)**

---

[7] Because Defendant Fisher raises no contentions specific to the allegations of the SAC as to him, the Court does not revisit whether the SAC alleges sufficient facts to state a Fourth Amendment claim against Defendant Fisher.

13cv1417-WQH-NLS

Plaintiffs' fifth claim for violation of the Fourth Amendment's prohibition against unreasonable seizures alleges that Defendant Nelson: (1) took no action to protect Yañez; (2) conspired with Defendant Diaz to violate Yañez's Fourth Amendment rights; (3) conspired with Defendant Diaz to violate Murietta's Fourth Amendment rights, foreseeably resulting in Yañez's death; (4) conspired with Defendant Diaz to cover-up the facts of Yañez's death after the fact; (5) provoked a violent confrontation between the agents and Yañez; and (6) ratified Defendant Diaz's actions after the fact.

Defendant Nelson moves for qualified immunity on Plaintiffs' fifth claim on the ground that the SAC states no viable theories of secondary liability on which to hold Defendant Nelson liable.

### i. Failure to Intervene

Defendant Nelson contends that the allegations of the SAC demonstrate that he did not have time to intervene to prevent Agent Diaz from shooting Yañez. Plaintiffs contend that the SAC sufficiently alleges that Defendant Nelson had enough time to intervene.

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996). "Importantly, however, officers can be held liable for failing to intercede only if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).

Under the agents' version of events, the SAC alleges that Defendant Diaz arrived to help Defendant Nelson subdue Murietta while the two were "struggl[ing] on the ground." (ECF No. 61 at 13). The SAC further alleges:

> Agent Nelson acknowledges that then, without any warning to Yañez and any further alleged throwing of a rock or a board by Yañez, Agent Nelson pulled away from the scuffle with Murietta. Agent Diaz removed his sidearm from its holster, uttered not a single additional word, and shot Yañez in the head. A sufficient amount of time elapsed between Agent Diaz standing up from the scuffle with Murietta and Agent Diaz shooting

Yañez for Agent Nelson to intervene and stop the shooting. *Id.* at 13-14.

Under Murietta's version of events, the SAC alleges that, "[i]n an apparent effort to stop the attack, Yañez felt compelled to yell that he was going to use his cellphone to take video and pictures of the beating. Upon hearing Yañez's response to the Agents' attack on Murietta, Agent Diaz stopped beating Murietta, stood up, and, without warning to Yañez or without any kind of provocation from Yañez that would justify Agent Diaz's use of deadly force, shot Yañez in the head." *Id.* at 16.

The Court need not accept as true the conclusory allegation that a "sufficient amount of time elapsed" between Defendant Diaz standing up and Defendant Diaz shooting Yañez "to intervene and stop the shooting." *Sprewell*, 266 F.3d at 988 (noting that a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). In addition, this conclusory allegation contradicts the factual allegations under both the agents' and Murietta's versions of events. As stated in the Court's September 3, 2014 Order, "[o]n these facts, Agent Nelson had no opportunity to intervene because he was in the middle of a scuffle with Murietta, and he was given no indication from Agent Diaz that deadly force would be used." (ECF No. 46 at 23). The Court concludes that the SAC fails to state a plausible Fourth Amendment claim against Defendant Nelson for failure to intervene.

## ii. Conspiracy to Violate Fourth Amendment Rights

Defendant Nelson contends that the SAC fails to allege facts demonstrating a "meeting of the minds" between Defendants Diaz and Nelson, and fails to specify the constitutional violation that the agents conspired to commit. (ECF No. 65-1 at 31). Plaintiffs contend that the SAC cures the deficiencies identified by the Court in its September 3, 2014 Order by specifying how Defendants Nelson and Diaz conspired: "to unlawfully beat Murietta and unlawfully provoke Yañez to respond to this beating...." (ECF No. 71 at 27). Plaintiffs contend that Defendant Nelson can be liable

for the shooting of Yañez because it was done in furtherance of the conspiracy. In reply, Defendant Nelson contends that he cannot be liable for unforeseeable consequences stemming from the alleged conspiracy.[8]

To establish defendants' liability for conspiracy, "a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989)) (internal quotations omitted). "The defendants must have, by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." *Id.* (citing *Gilbrook v. City of Westminister*, 177 F.3d 839, 856 (9th Cir. 1999)). "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only be rarely available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Id.* at 1302. "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am.*, 865 F.2d at 1541. To establish that the conspiracy was the cause of the plaintiff's injuries, "the requisite causal chain can occur through the 'setting in motion [of] a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Harris v. Roderick*, 126 F.3d 1189, 1196 (9th Cir. 1997) (citing *Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978)).

Plaintiffs' fifth claim alleges that "Agent Nelson and Agent Diaz knowingly, intentionally, and/or with actual malice, combined, conspired and confederated together to deprive Yañez of his clearly established Fourth Amendment constitutional rights." (ECF No. 61 at 58). In the factual allegations section of the SAC, Plaintiffs allege that "Agent Nelson conspired with Agent Diaz to unlawfully beat Murietta and unlawfully

---

[8] Defendant Nelson does not contend that the alleged conspiracy does not violate a clearly established constitutional right.

provoke Yañez to respond to this beating either by throwing objects at Agent Nelson or threatening to record the beating with a cell phone. In commission and in furtherance of that conspiracy, Agent Diaz shot Yañez, a result that Agent Nelson knew, or should have known, would occur." *Id.* at 14. Plaintiffs allege that "Agent Nelson and Agent Diaz conspired to and did actually beat Murietta...." *Id.* at 16. The SAC therefore alleges two conspiracy theories: (1) conspiracy to violate Yañez's Fourth Amendment rights by provoking Yañez to respond to the beating Murietta; and (2) conspiracy to violate Murietta's Fourth Amendment rights by beating Murietta, which proximately resulted in Yañez's death.

There are no facts from which the Court can reasonably infer an agreement to violate Yañez's Fourth Amendment rights. The SAC alleges that Defendant Diaz shot Yañez without giving Defendant Nelson any indication that he was going to shoot Yañez. The facts alleged, when viewed in a light most favorable to Plaintiffs, permit the inference that Defendants Diaz and Nelson agreed to apply excessive force on *Murietta*, but not Yañez. The Court concludes that Plaintiffs' first conspiracy theory is not plausible on the facts alleged.

With respect to Plaintiffs' second conspiracy theory, the SAC alleges sufficient facts to permit the inference that Defendants conspired to violate Murietta's Fourth Amendment rights. *See* ECF No. 61 at 15 ("[B]oth Agent Nelson and Agent Diaz had Murietta down on the ground and were beating him. Agent Nelson and Diaz easily outweighed and outmuscled the slight-framed Murietta, who was face down in the dirt road. In fact, when Murietta was eventually taken away by a cadre of Border Patrol agents, he was disoriented and his mouth was covered with his own blood."); *Mendocino Envtl. Ctr.*, 192 F.3d at 1302 (noting that the agreement to violate constitutional rights must often be established by circumstantial evidence). Defendants Diaz and Nelson can be liable under this theory if they 'set[] in motion ... a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Harris*, 126 F.3d at 1196. The foreseeability of

Yañez's death resulting from the application of excessive force to Murietta is a factual question not properly resolved on a motion to dismiss. The Court concludes that Plaintiffs' second conspiracy theory states a plausible claim for relief.

### iii. Provocation

Defendant Nelson contends that there are no cases permitting provocation liability on the facts presented here, namely, where a government official's excessive force on a citizen provokes force used by a third party citizen, who is then subdued by excessive force by a third party government official. Defendant Nelson contends that Plaintiffs' provocation theory is implausible on the facts alleged in the SAC because Defendant Nelson could not have foreseen that Yañez would have responded to his struggle with Murietta, or that Defendant Diaz would in turn respond to Yañez's response.

Plaintiffs contend that the SAC adds additional provocation allegations to clarify their provocation theory.

The SAC alleges that "Agent Nelson further unlawfully provoked Yañez to respond to the Agents' beating of Murietta either by throwing objects at Agent Nelson or threatening to record the beating with a cell phone. As a result of that provocation, Agent Diaz shot Yañez, a result that Agent Nelson knew, or should have known, would occur." (ECF No. 61 at 14). The SAC alleges that the beating of Murietta was itself a Fourth Amendment violation that Defendant Nelson should have known would cause Yañez to respond and lead to escalation of the conflict.

"[W]here an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Billington v. Smith*, 292 F.3d 1177, 1189 (2002). The application of deadly force, even if it is by itself reasonable, is rendered "*unreasonable* as a matter of law" because it was proximately caused by the "initial unconstitutional provocation." *Id.* at 1190-91 (emphasis in original).

Plaintiffs have identified no cases where *Billington* was extended to impose

liability on a government official for applying excessive force on one individual that caused a second government official to inflict the alleged injury on a second individual.[9] The Court concludes that Plaintiffs have failed to allege facts demonstrating that Defendant Nelson violated Yañez's clearly established constitutional rights on an unconstitutional provocation theory.

### iv. Conspiracy After-the-Fact and Ratification

In a long footnote, Defendant Nelson contends that after-the-fact conspiracy and ratification are not viable constitutional violations. Plaintiffs do not address this contention in opposition.

"To have an actionable *Bivens* conspiracy claim, [the plaintiff] must establish (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. A conspiracy to deprive a plaintiff of a civil rights action by lying or concealing evidence might constitute such an actionable deprivation." *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991); *see also Dooley v. Reiss*, 736 F.2d 1392, 1394-95 (9th Cir. 1984) ("A successful attempt by defendant to deprive a potential plaintiff of his right to bring a section 1983 action might well amount to an actionable deprivation of federally protected rights.").

Plaintiffs' fifth claim alleges that Yañez's right to be free from an unreasonable seizure was violated because excessive force caused his death. Even assuming Plaintiffs may hold Defendant Nelson liable for allegedly covering up the circumstances

---

[9] The closest case appears to be *Espinosa v. City and Cnty. of S.F.*, 598 F.3d 528 (9th Cir. 2010). In *Espinosa*, one officer violated the plaintiffs' Fourth Amendment rights by illegally entering his residence. An escalation ensued, and two other officers shot the plaintiff dead. The U.S. Court of Appeals for the Ninth Circuit held that the district court "did not err in finding that there are genuine issues of fact regarding whether the officers intentionally or recklessly provoked a confrontation with [the Plaintiff]." *Id.* at 539.

Plaintiffs have failed to demonstrate that a plaintiff may recover on a provocation theory stemming from an initial violation of someone else's constitutional rights, and have therefore failed to establish that such right was clearly established at the time of Yañez's death.

surrounding the death of Yañez, Plaintiffs may not do so when the only injury alleged is Yañez's death itself. In other words, Plaintiffs cannot plausibly allege "an actual deprivation of [Yañez's Fourth Amendment right to be free from unreasonable seizure] resulting from [an] agreement[,]" *Ting*, 927 F.2d at 1512, when that agreement is alleged to have occurred *after* the Fourth Amendment violation. The Court concludes that the SAC fails to allege plausible conspiracy after-the-fact or ratification theories.

### v. Conclusion

The Court concludes that Defendant Nelson is entitled to qualified immunity on Plaintiffs' fifth claim on all secondary liability theories except a conspiracy between Defendants Nelson and Diaz to violate Murietta's Fourth Amendment rights. Because the Court finds that further amendment would be futile, Plaintiff's fifth claim is dismissed with prejudice as to Defendant Nelson on all theories alleged except a conspiracy between Defendants Nelson and Diaz to violate Murietta's Fourth Amendment rights.

## VI. Conclusion

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 65) is GRANTED in part and DENIED in part. The Motion to dismiss is GRANTED as follows:

1. The SAC is DISMISSED WITH PREJUDICE as to Defendant Aguilar for lack of personal jurisdiction.

2. Plaintiffs' fourth claim is DISMISSED WITH PREJUDICE as to Defendants Napolitano and Bersin. Defendants Napolitano and Bersin are entitled to qualified immunity on Plaintiffs' fourth claim.

3. Plaintiffs' fifth claim is DISMISSED WITH PREJUDICE as to Defendant Nelson on all theories of secondary liability except conspiracy between Defendants Nelson and Diaz to violate Murietta's Fourth Amendment rights. Defendant Nelson is entitled to qualified immunity on

Plaintiffs' fifth claim, except on the theory that Defendants Nelson and

Diaz conspired to violate Murietta's Fourth Amendment rights.

The Motion to dismiss is DENIED in all other respects.

DATED:  May 1, 2015

William Q. Hayes

**WILLIAM Q. HAYES**
United States District Judge