# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA DEL SOCORRO QUINTERO PEREZ, BRIANDA ARACELY YANEZ QUINTERO, CAMELIA ITZAYANA YANEZ QUINTERO, and J.Y., a Minor<br><br>Plaintiffs,<br>vs.<br>DORIAN DIAZ, *et al*,<br><br>Defendants. | CASE NO. 13-cv-1417-WQH-BGS<br><br>ORDER |

HAYES, Judge:

The matters before the Court are the Motions for Summary Judgment filed by Defendants Dorian Diaz (ECF No. 177) and Michael J. Fisher (ECF No. 179) ("Defendants").

## I. BACKGROUND

On June 17, 2013, Plaintiffs commenced this action by filing a Complaint in this Court. (ECF No. 1). On September 22, 2016, Plaintiffs filed the Fourth Amended Complaint ("FAC"), which is the operative complaint in this action. (ECF No. 165). In the FAC, Plaintiffs assert *Bivens* claims for Fourth Amendment unreasonable seizure and Fifth Amendment due process against Defendant Diaz and Defendant Fisher. *See id.* at ¶¶ 138-152.

On April 1, 2017, Defendant Diaz filed a Motion for Summary Judgment. (ECF No. 177). On April 1, 2017, Defendant Fisher filed a Motion for Summary Judgment. (ECF No. 179). On June 26, 2017, Defendants filed a notice of supplemental authority. (ECF No. 190). On July 17, 2017, the Court ordered the parties to submit supplemental briefing on the notice of supplemental authority. (ECF No. 192). On August 15, 2017, the Court heard oral argument on both Motions for Summary Judgment. (ECF No. 197). On August 23, 2017, Defendants filed a second notice of supplemental authority. (ECF No. 198). On September 7, 2017, Plaintiffs filed a response to Defendants' second notice of supplemental briefing. (ECF No. 200).

**II. FACTUAL BACKGROUND**

On June 21, 2011, Jesus Alfredo Yañez Reyes ("Yañez") and Jose Ibarra-Murietta ("Murietta") crossed the border from Mexico to the United States through a hole in the primary border fence approximately 1.6 miles west of the San Ysidro Port of Entry. Both Yañez and Murietta were not United States citizens, and entered the United States illegally.

At approximately 7:00 p.m., Defendant Diaz observed Yañez and Murietta hiding in the brush on the north side of the primary border fence while sitting in his patrol car. Defendant Diaz radioed for assistance from Agent Nelson, who was the closest Agent in the area; Agent Nelson arrived approximately one minute later. As Defendant Diaz and Agent Nelson got out of their patrol cars to pursue the suspects, Yañez retreated south through the hole in the fence. Meanwhile, Murietta remained on the north side of the primary border fence and physically resisted Agent Nelson's attempt to arrest him.

After continuing to struggle with Murietta, Agent Nelson backed away from Murietta to create distance between the two. Murietta then began running eastward away from Agent Nelson. As he was running, Murietta remained in the United States on the northern side of the primary border fence. Agent Nelson chased Murietta until Murietta eventually tripped. Agent Nelson jumped onto Murietta to try and apprehend

him.

Yañez reappeared on the primary border fence above the area where Agent Nelson and Murietta were grappling on the ground. Defendant Diaz and Agent Nelson testified at their respective depositions that, after reappearing on top of the fence, Yañez threw rocks and a wooden board in the direction of Agent Nelson and Murietta. (ECF No. 177-10 at 15-16, 42; ECF No. 182-1 at 22). Murietta testified at his deposition that he did not see Yañez throw anything. (ECF No. 180-3 at 29). Defendant Diaz shouted multiple warnings to Yañez to stop interfering with Murietta's arrest. After Yañez did not comply with Defendant Diaz's instructions, Defendant Diaz drew his service firearm and pointed it at Yañez. Yañez saw the weapon and disappeared back down the south side of the primary border fence.

Defendant Diaz attempted to help Agent Nelson apprehend and handcuff Murietta. As Agent Nelson continued to try to handcuff Murietta, Defendant Diaz walked further west in an attempt to surprise Yañez in the event he reappeared on the fence. Defendant Diaz then observed Yañez reappear at the top of the primary border fence, make a fist, and begin the motion of throwing something down towards Agent Nelson and Murietta. Defendant Diaz drew his service weapon and shot Yanez. Murietta was subsequently arrested.

**III. SUMMARY JUDGMENT STANDARD**

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." FED. R. CIV. P. 56(a). The moving party has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 322. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. To avoid summary judgment, the opposing party cannot rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## IV. *BIVENS* CAUSE OF ACTION

### A. Contentions of the Parties

Defendants contend that this Court should decline to extend a *Bivens* remedy to Plaintiffs, under the facts of this case, pursuant to the Supreme Court's recent opinion in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Defendants contend that this case presents a new context under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and that special factors weigh against extending a *Bivens* remedy to the Plaintiffs' claims. (ECF No. 193 at 11-14).

Plaintiffs contend that this case does not present a new *Bivens* context because *Bivens* also "involved a Fourth Amendment claim of law enforcement's use of excessive force." (ECF No. 194 at 9). Plaintiffs contend that the special factors articulated in *Abbasi* favor allowing a *Bivens* action in this case if the Court determines this case presents a new *Bivens* context. Plaintiffs contend that extending a *Bivens* action to this case would not affect national security, would not interfere with foreign relations, and would not relate to the "the myriad immigration laws and

regulations meant to screen, admit, or remove foreign nationals from the United States." *Id.* at 19-21. Plaintiffs contend that the unavailability of injunctive relief or any other form of relief for Plaintiffs "requires that the Court recognize a *Bivens* claim" in this case. *Id.* at 25.

### B. Applicable Law & Recent Supreme Court Guidance

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held, for the first time, that "even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) (citing *Bivens*, 403 U.S. at 397). While the *Bivens* Court stated that the Fourth Amendment does not provide for money damages "'in so many words[,]'" it noted that "Congress had not foreclosed a damages remedy in 'explicit' terms and that no 'special factors' suggested that the Judiciary should 'hesitat[e]' in the face of congressional silence." *Id.* (quoting *Bivens*, 403 U.S. at 396-97).

In *Abbasi*, the Supreme Court recently examined "the reach and the limits of [its] precedent" concerning "*Bivens* and the ensuing cases[.]" *Id.* at 1854. The *Abbasi* Court observed that in the decades following *Bivens*, the Court

> has 'consistently refused to extend Bivens to any new context or new category of defendants.' . . . For example, the Court declined to create an implied damages remedy in the following cases: a First Amendment suit against a federal employer, *Bush v. Lucas*, 462 U.S. 367, 390, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); a race-discrimination suit against military officers, *Chappell v. Wallace*, 462 U.S. 296, 297, 304–305, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); a substantive due process suit against military officers, *United States v. Stanley*, 483 U.S. 669, 671–672, 683–684, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); a procedural due process suit against Social Security officials, *Schweiker v. Chilicky*, 487 U.S. 412, 414, 108 S.Ct. 2460, 101 LED.2d 370 (1988); a procedural due process suit against a federal agency for wrongful termination, *FDIC v. Meyer*, 510 U.S. 471, 473–474, 114 S.Ct. 996, 127 LED.2d 308 (1994); an Eighth Amendment suit against a private prison operator, *Malesko*, supra, at 63, 122 S.Ct. 515; a due process suit against officials from the Bureau of Land Management, *Wilkie v. Robbins*, 551 U.S. 537, 547–548,

> 562, 127 S.Ct. 2588, 168 LED.2d 389 (2007); and an Eighth Amendment suit against prison guards at a private prison, *Minneci v. Pollard*, 565 U.S. 118, 120, 132 S.Ct. 617, 181 LED.2d 606 (2012).

*Id.* at 1857 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

The Court "recognized what has come to be called an implied cause of action in two cases involving other constitutional violations" following *Bivens*. *Id.* at 1854. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court ruled that the Fifth Amendment's Due Process Clause provided the plaintiff with a monetary remedy for gender discrimination against a Congressman for firing her because she was a woman. In *Carlson v. Green*, 446 U.S. 14 (1980), the Court ruled that the Eighth Amendment's Cruel and Unusual Punishment Clause gave the plaintiff a cause of action for damages against federal prison officials for failing to treat the plaintiff's asthma. In *Abbasi*, the Court stated that "[t]hese three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." 137 S. Ct. at 1855.

The *Abbasi* Court stated that "[i]n most instances, the Court's precedents now instruct [that] the Legislature is in the better position to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" *Id.* at 1857 (quoting *Schneider v. Chilicky*, 487 U.S. 412, 426-27 (1988) (citation and quotation marks omitted)). The Court concluded that its precedent following the *Bivens* case

> now make clear that a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' This Court has not defined the phrase 'special factors counselling hesitation.' The necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative.

*Id.* at 1857-58 (quoting *Carlson*, 446 U.S. at 18) (citation and quotation marks omitted).

> The Court stated that
>
> > the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.

*Id.* at 1858. The Court further stated that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

Courts must determine whether a claim "presents a new *Bivens* context" in addition to performing a special factors analysis. *Id.* at 1859. The Court stated,

> The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60. If a court determines that a particular case does present a new *Bivens* context, then the court is "required" to proceed with a special factors analysis "before allowing [a] damages suit to proceed." *Id.* at 1860.

In *Abbasi*, the Court addressed whether a *Bivens* remedy should be available for claims challenging the conditions of confinement imposed on individuals taken into custody pursuant to a formal policy adopted by several Executive Branch officials following the September 11 terrorist attacks. The Court first determined that the case

presented a new *Bivens* context because the petitioners' claims "bear little resemblance to the three *Bivens* claims the Court has approved in the past[.]" *Id.* at 1860. The Court then performed a special factors analysis and determined that petitioners were not entitled to a *Bivens* remedy. *Id.* at 1860-62.

The first special factor that the *Abbasi* Court found counseled against the providing a *Bivens* action was the fact that the petitioners' claims were against high-level executive officials, including the former Attorney General, the former Director of the FBI, and the former Commissioner of the Immigration and Naturalization Service. *Id.* The Court noted that "a *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others[,]" and that "*Bivens* is not designed to hold officers responsible for acts of their subordinates." *Id.* The Court stated that, when creating a *Bivens* action

> would necessarily require inquiry and discovery into the whole course of the discussions and deliberations that led to the policies and governmental acts being challenged[, t]hese consequences counsel against allowing a *Bivens* action against the Executive Officials for the burden and demand of litigation might well prevent them–or, to be more precise, future officials like them, from devoting the time and effort required for the proper discharge of their duties.

*Id.* The Court stated that lower courts should hesitate to allow a *Bivens* action if doing so "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch." *Id.* at 1861.

The second special factor that the *Abbasi* Court stated counseled against providing a *Bivens* action was that petitioners' claims challenged not just "standard 'law enforcement operations'" but "major elements" of the federal government's response to the September 11 terrorist attacks. *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)). The Court noted that "[n]ational-security policy is the prerogative of the Congress and President[,]" and that "[separation-of-powers] concerns are even more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other

equitable relief." *Id.* While the Court cautioned that "national-security concerns must not become a talisman used to ward off inconvenient claims[,]" it concluded that the nature of the petitioners' claims weighed against providing a *Bivens* action. *Id.* at 1862.

The final factor that the *Abbasi* Court found counseled against providing a *Bivens* action was that "respondents had available to them 'other alternative forms of judicial relief,'" including injunctive relief and petitions for a writ of habeas corpus. *Id.* at 1863 (quoting *Minneci v. Pollard*, 565 U.S. 118, 124 (2012)). The Court noted that "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id. a*t 1863; *see id.* at 1862 ("It is of central importance, too, that this is not a case like *Bivens* or *Davis* in which 'it is damages or nothing.'") (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring)).

After weighing these factors, the Court held that the "balance to be struck, in situations like this one, between deterring constitutional violations and freeing high officials to make the lawful decisions necessary to protect the Nation in times of great peril . . . is one for the Congress, not the Judiciary, to undertake." *Id.* The Court concluded that the "Court of Appeals erred by allowing respondents' detention policy claims to proceed under *Bivens*." *Id.*

**C. Analysis**

Following the Supreme Court's guidance in *Abbasi*, this Court must determine whether Plaintiffs' claims presents a new *Bivens* context by examining whether the claims are "different in a meaningful way from previous *Bivens* cases decided by th[e Supreme] Court[.]" *Id.* at 1859. Plaintiffs seek damages for the alleged use of excessive force by a border patrol agent against an alien who illegally entered the United States through a hole in the primary border fence, retreated back through the hole in an attempt to avoid arrest, and was shot after reappearing on top of the border fence. Plaintiffs also seek damages against a supervisor for an alleged policy within

the Border Patrol that authorized agents to use deadly force in response to individuals throwing rocks.

In *Bivens*, the Supreme Court recognized an implied cause of action in order to "compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures" in the Fourth Amendment. *Id.* at 1854 (citing *Bivens*, 403 U.S. at 397). The petitioner in *Bivens* made a claim against FBI agents for handcuffing him in his own home without a warrant. *Bivens*, 403 U.S. at 389. While this case and *Bivens* both contain alleged Fourth Amendment violations, the present action does not resemble *Bivens* in any "meaningful way." *Abbasi*, 137 S. Ct. at 1859. Both Defendants in this action were operating under different "statutory . . . [and] legal mandate[s.]" *Id.* The *Bivens* Court did not have the occasion to consider "the presence of potential special factors" concerning the international border present in this case. *Id.* Additionally, Petitioners' claims against Defendant Fisher challenge a "high-level executive policy." *Id.* at 1856, 1860.

This Court finds that Plaintiffs' claims present a new *Bivens* context, as the claims "bear little resemblance to the three *Bivens* claims the Court has approved in the past." *Abbasi*, 137 S. Ct. at 1860. Therefore, the Court "consider[s] the relevant special factors in the whole context of [Plaintiffs'] . . . claims" to determine whether "the Court should extend a *Bivens*-type remedy to those claims." *Id.* at 1859.

Plaintiffs seek damages for the alleged use of excessive force by a border patrol agent against an alien who illegally entered the United States through a hole in the primary border fence, retreated back through the hole in an attempt to avoid arrest, and was shot after reappearing on top of the border fence. The nature of Plaintiffs' claims invoke a number of "relevant special factors" identified by *Abbasi*, including that they involve "decisions concerning national-security policy." *Id.* at 1859, 1861. The nature and circumstances of Yañez's death adjacent to the primary border fence separating the United States and Mexico involve "more than standard 'law

enforcement operations.'" *Id.* at 1861 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)). Defendant Diaz and Agent Nelson confronted Yañez and Murietta after they had already entered into the United States through a hole in the primary border fence. Yañez then retreated back through the hole in the fence in an attempt to avoid arrest. The agents' inability to proceed over the primary border fence into Mexico is a law enforcement, national security, and territorial issue unique to the Border Patrol. *See* ECF No. 177-7 at 2-3, Villareal Decl. at ¶ 5 ("Pursuant to normal patrol operations, Agents in our Sector do not jump over the primary border fence to enter the south side, as we consider the south side of the metal corrugated fence to constitute Mexican territory.").

Courts have consistently held that "the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). "The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Id.* at 152. *See also Plyler v. Doe*, 457 U.S. 202, 237 (1982) (Powell, J., concurring) ("[B]ecause of the intractability of the problem" of "[i]llegal aliens" entering the United States from Mexico, "Congress [is] vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens[.]"); *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) ("The United States has a strong interest in protecting its borders . . . ."). "[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). The Court concludes that the unique circumstances surrounding Yañez's death implicate national security issues related to the security of our nation's borders and constitute a special factor counseling against creating a *Bivens* remedy under *Abbasi*. *See also Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) ("immigration issues 'have the

natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*.") (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc)).

Plaintiffs also seek the creation of a *Bivens* remedy against Defendant Fisher, the former Chief of the Border Patrol, for an alleged policy within the Border Patrol that authorized agents to use deadly force in response to individuals throwing rocks. The Supreme Court emphasized in *Abbasi* that a proper "*Bivens* claim is brought against the individual official for his or her own acts, not the acts of others[,]" and that "*Bivens* is not designed to hold officers responsible for acts of their subordinates." 137 S. Ct. at 1860. The Court finds that this factor further counsels against creating a *Bivens* remedy for Plaintiffs' claims against Defendant Fisher.

Unlike in *Bivens* or *Davis*, the Plaintiffs' legal remedies in this case were not limited to *Bivens* claims. *See Minneci v. Pollard*, 565 U.S.118, 125-126 (2012) (stating that the availability of state tort remedies "constitute[d] a 'convincing reason for the Judicial Branch to refrain from providing a new'" *Bivens* cause of action (quoting *Willkie v. Robbins*, 551 U.S. 537, 550 (2007))). In the FAC, Plaintiffs include two claims under the Federal Tort Claims Act ("FTCA") against the United States. *See* ECF No. 165 at ¶¶ 153-163.[1]

"[H]aving considered the relevant special factors in the whole context of" Plaintiffs' claims against Defendants Diaz and Fisher, the Court concludes that "those factors show that whether a damages action should be allowed is a decision for the

---

[1] On March 6, 2017, the Court granted Defendants' motion to dismiss the FTCA claims from the FAC, concluding that the claims were barred by the FTCA's statute of limitations and that Plaintiffs were not entitled to equitable tolling of the FTCA's statute of limitations. *See* ECF No. 174 at 5.

A separate action is pending before this Court in *Paredes Nino et al v. United States Customs and Border Protection et al*, Case No. 13-cv-00469-WQH-BGS (S.D. Cal. filed Feb. 27, 2013) ("the *Nino* action"). The *Nino* action was brought by Mayra Paredes Nino individually and as the wife of Yañez against the United States, among other parties. The Third Amended Complaint in the *Nino* action alleges wrongful death and emotional distress claims under the FTCA arising from Yañez's death, and the Court found that Plaintiff's FTCA claims could proceed. *See* 13-cv-00469-WQH-BGS, ECF Nos. 61, 67, 72.

Congress to make, not the courts." *Abbasi*, 137 S. Ct. at 1859-60. This conclusion is consistent with the Supreme Court's recent admonition that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Defendants' Motions for Summary Judgment are GRANTED to the extent they seek to dismiss Plaintiffs' attempted *Bivens* claims against both Defendants Diaz and Fisher.

Dismissal of Plaintiffs' proposed *Bivens* claims renders it unnecessary to address Defendants' contention that Plaintiffs are unable to assert a claim under the Fourth Amendment. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) ("The Fourth Amendment question in this case, [whether a Mexican boy standing on Mexican soil who was shot and killed by a United States Border Patrol Agent standing on United States soil had any Fourth Amendment rights], however, is sensitive and may have consequences that are far reaching. It would be imprudent for this Court to resolve that issue when, in light of the intervening guidance provided in *Abbasi*, doing so may be unnecessary to resolve this particular case.").

## V. QUALIFIED IMMUNITY

### A. Contentions of the Parties

Defendant Diaz further contends that the recent decision of the Court of Appeals' in *S.B. v. Cty. of San Diego*, 864 F.3d 1010 (9th Cir. 2017) requires that a court must find that a prior binding case exists with similar circumstances and in the same context where excessive force under the Fourth Amendment was found prior to denying qualified immunity to a federal agent. Defendant Diaz contends that Defendants are not aware of any case decided prior to June 21, 2011 which reasonably warned Agent Diaz that his actions violated Yañez's Fourth Amendment rights. Defendant Diaz contends that he is entitled to qualified immunity because his actions were reasonable under the circumstances.

Plaintiffs contend that disputes of material fact exist as to whether the use of force by Defendant Diaz was excessive under the Fourth Amendment.

**B. Applicable Law**

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *S.B.*, 864 F.3d at 1013 (quoting *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016)). If a court determines that there has been a violation of a constitutional right, the court must determine whether the right was clearly established at the time of the officer's alleged misconduct in order to determine whether the officer is entitled to qualified immunity. If the right was not clearly established at the time of the alleged misconduct, "the officer receives qualified immunity." *S.B.*, 864 F.3d at 1015.

> A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 LED.2d 985 (2012) (internal quotation marks and alteration omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 179 LED.2d 1149 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 LED.2d 271 (1986).

*Mullenix v. Luna,* 136 S. Ct. 3095, 308 (2015).

**C. Analysis**

The Court concludes that any alleged violation of Yañez's Fourth Amendment right to be free from excessive force was not "'clearly established at the time of the . . . alleged misconduct'" in this case. *S.B.*, 864 F.3d at 1013 (quoting *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016)). In order for Plaintiffs to defeat summary judgment on this issue, there must be precedent that existed on June 21, 2011 and "put [Defendant Diaz] on clear notice that using deadly force in these particular circumstances would be excessive." *Id.* at 1015.

In this case, Yañez illegally entered the United States through a hole in the primary border fence, retreated back through the hole in an attempt to avoid arrest, and reappeared on top of the border fence. Just before Defendant Diaz shot Yañez, Yañez appeared to attempt to throw an object at Agent Nelson.

Plaintiffs have not identified any precedent at the time of the June 21, 2011 incident that would placed the question of whether Yañez's Fourth Amendment right against excessive force was violated "'beyond debate.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Therefore, the Court concludes that, even if Plaintiffs could assert a *Bivens* claim for the alleged violation of Yañez's Fourth Amendment rights, Defendant Diaz would be entitled to qualified immunity on Plaintiffs' claim against him.

## VI. CONCLUSION

For the reasons discussed above, IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment (ECF Nos. 177 & 179) are GRANTED.

IT IS FURTHER ORDERED that Defendant Diaz's request for judicial notice (ECF No. 177-3), Defendant Fisher's request for judicial notice (ECF No. 179-3) and Defendants' written objections and/or motion to strike new evidence in Plaintiffs' supplemental brief (ECF No. 195) are DENIED as moot.

The Clerk of the Court shall enter judgment in favor of the Defendants and against the Plaintiffs as to all claims in this action.

DATED: September 21, 2017

**WILLIAM Q. HAYES**
United States District Judge